THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ARTHUR KNIGHT, Defendant.

City Magistrates' Court of New York, Borough of Manhattan, May 21, 1962.

*John J. Maguire* for plaintiff. *Kunstler & Kunstler (William M. Kunstler* of counsel), for defendant. *Rowland Watts* for American Civil Liberties Union.

WALTER J. BAYER, City Magistrate. On Saturday, March 3, 1962, at about 5:00 P.M., the defendant joined with many others at Duffy Square, 46th and 47th Streets between Broadway and 7th Avenue, to hold a rally protesting the resumption by the United States of explosions of nuclear weapons in the atmosphere. This demonstration was intended to be a " silent vigil " — and publicized as such. Prior notice of this meeting was given to the Police Department.

The department in preparation for the demonstration placed barriers along Duffy Square and detoured 7th Avenue traffic onto Broadway. A large number of patrolmen, mounted as well as on foot, were assigned to the area to maintain proper order and to give appropriate protection from traffic hazards to the participants in the demonstration.

Not only were there people (estimated as numbering 2,000 to 3,000) gathered for the rally on Duffy Square, but there were large multitudes of spectators and pedestrians. The court is well aware that on Saturday afternoon, Times Square, of

which Duffy Square is a part, is a very busy, highly travelled area.

At about 5:30 P.M., the demonstration and rally were over. The Police Department thereupon permitted vehicular traffic to move and endeavored to keep people on the sidewalks. However, many participants, among them the defendant, instead of leaving the area, took up positions in the 7th Avenue roadway, shouting slogans such as "Ban The Bomb", "Our Children Want Good Milk", "No More Testing", "Don't—Let's Not Become Another Russia. Peace At All Costs".

Other participants (among them Itkin and Supernaw, defendants in a companion case decided simultaneously herewith) sat down in groups forming semicircles in the roadway at the corner of Broadway and 46th Street. As part of the publicized "silent vigil" technique, they simply stared blankly ahead, not moving and not saying a word.

Manifestly, the motive and purpose of this conduct, as of the rally itself, was to focus attention of the public and press in the most dramatic manner, upon the views opposing the expressed intention of the President to order resumption of nuclear weapon tests.

But, the consequences of this conduct were that the demonstrators, as well as the onlookers, did not leave the area, that normal traffic, both pedestrian and vehicular, could not be restored by the police, that what started as a "silent vigil" degenerated into a mob whose antitesting slogans were replaced by police baiting epithets, and whose "silent vigil" technique was replaced by a willful obstruction of vehicular traffic — all to induce publicity, not by the merits of their cause, but by the violence of their actions.

The defendant Knight, as he was standing in a group in the roadway 15 feet from the curb yelling slogans, was approached by Patrolman Grover D. Howell. He asked the group to go back on the sidewalk; all complied except Knight. Patrolman Howell "cautioned him again to move back on the sidewalk". The defendant did not move, but replied that he had a right to stand in the roadway shouting antitesting slogans. Patrolman Howell for the third time asked the defendant to move back, as he was stopping traffic. The defendant again did not move. Patrolman Howell then said to the defendant, "You are under arrest. I am taking you in." The officer put his hand on defendant's shoulder, defendant pulled it off and ran into a group upon the sidewalk. The officer was knocked down by others, lost a glove, was hit on the shoulder, but nevertheless went into the crowd to apprehend the defendant. Thereupon,

the defendant lay down on the sidewalk and would not move. It was necessary to carry the defendant into the police wagon.

As for Itkin and Supernaw, they too, were directed twice by the arresting officer to get up and move on. They continued sitting mute. The officer then placed them under arrest. As he proceeded to take a hold of Supernaw, Itkin locked arms with Supernaw. It was necessary for the arresting officer, together with fellow officers to pry them apart and to carry them to the police wagon.

The defendant Knight and in the companion case, Itkin and Supernaw were charged with disorderly conduct (Penal, Law, § 722)[1] and with violating section 1851[2] of the Penal Law (resisting public officer in the discharge of his duty).[3]

That section 722 (disorderly conduct) has been violated is not strongly contested for the evidence establishes that the defendant here and the defendants in the companion case violated this section.

However, it is urged that the charge under section 1851 of the Penal Law should be dismissed because basic concepts of fair play would be violated by holding the defendants to answer not only for their disorderly conduct but also for resisting their arrest and further, that only in totalitarian States would charges lie under these circumstances. The court is told that co-opera-

---

1. "§ 722. Disorderly conduct. Any person who with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, commits any of the following acts shall be deemed to have committed the offense of disorderly conduct:

* * *

"2. Acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others;

"3. Congregates with others on a public street and refuses to move on when ordered by the police".

2. "§ 1851. Resisting public officer in the discharge of his duty. A person who, in any case or under any circumstances not otherwise specially provided for, wilfully resists, delays, or obstructs a public officer in discharging, or attempting to discharge, a duty of his office, is guilty of a misdemeanor."

3. Section 435 of the New York City Charter provides in part as follows: "435. Department; duties.— The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public streets, sidewalks, parks and places; protect the rights of persons and property, guard the public health, preserve order at elections and all public meetings and assemblages; subject to the provisions of law and the rules and regulations of the commissioner of traffic, regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; remove all nuisances in the public streets, parks and places".

tion by an arrested person with the police officer is not mandatory and to require it under threat of a penalty in addition to the one for which the arrest is made, offends " our sense of justice."

Our penal statutes have endeavored to protect duly constituted officers in the lawful exercise of their duties from resistance to arrest by persons who have violated the law. To make an arrest, the arresting officer must take the person into custody by actual restraint of the person or by his submission to the custody of the officer (Code Crim. Pro., §§ 167, 171). An arresting officer is specifically given authority to use all necessary means to effect an arrest if a defendant either flee or forcibly resist (Code Crim. Pro., § 174). Thus, subdivision 5 of section 242 of the Penal law imposes criminal penalties for assault upon an officer to prevent or resist lawful apprehension or detention of the arrested person; sections 1824 and 1825 impose criminal penalties for attempting by means of any threat or violence to deter or prevent, or for knowingly resisting by force or violence, an officer in the performance of his duty.

It was the duty to be discharged by the arresting officers here to take Knight, Itkin and Supernaw into custody for the crime committed in their presence. Had they assaulted the officers or attempted so to do, or threatened them, there would be no question of the application of the appropriate penal statutes in addition to section 722, the violation of which precipitated their arrest.

Amazing indeed, is the claim that holding these defendants to answer the charge of resisting an officer in the performance of his duty would offend the sense of justice which prevails in our democracy. The 14th Amendment to the Constitution assures to these defendants important " Blessings of Liberty " (U. S. Const., Preamble). Right of assembly and freedom of speech are cornerstones of these liberties. " The genius of democrocy is its willingness to garner wisdom from the total brain-power of the community. Uncommunicated ideas serve no social, and little, if any, private purpose. Without freedom to communicate there is small incentive or stimulation for thought. The most subtle of punishments is solitary confinement. The imprisoned mind decays. For these reasons freedom of speech, press, and assembly are the foundations of democracy, the tools of society's thinking process." (Mendelson, Justices Black and Frankfurter; Conflict in the Court, p. 52 [Univ. of Chicago Press, 1961].)

Indeed, the police action here, unlike police action in other lands was not to frustrate, diminish or destroy the free exercise

of these " Blessings of Liberty ". It was specifically to preserve and to ensure noninterference with these freedoms.[4] But, the defendants took it upon themselves to go beyond the proper exercise of the right of assembly and the right of freedom of speech, and in their fashion for the purpose of attracting public attention and making press headlines, engaged in conduct which cannot be condoned or justified.

Constitutional immunity does not protect speech which incites an immediate breach of the peace; no public interest is served in permitting that type of speech. Protecting freedom of speech in all cases depends upon the circumstances of the occasion and must be considered in the scale of values serving the public interest. (Concurring Opinion of Mr. Justice FRANKFURTER, *Dennis* v. *United States*, 341 U. S. 494, 544.)

In *Niemotko* v. *Maryland* (340 U. S. 268, 271) a conviction on a charge of disorderly conduct was overturned as an invasion of the right to speak. The Supreme Court did not hesitate to examine the evidence and to emphasize: " at the time of the arrest of each of these appellants, there was no evidence of disorder, threats of violence or riot. There was no indication that the appellants conducted themselves in a manner which could be considered as detrimental to the public peace or order "; see, particularly, FRANKFURTER, J., " Legislatures, local authorities, and the courts have for years grappled with claims of the right to disseminate ideas in public places as against claims of an effective power in government to keep the peace and to protect other interests of a civilized community ". (*Id.* pp. 273–274.)

---

4. " Free speech problems are arising constantly in private lives. They are not limited to courtrooms and Congressional offices. Shall I let my child read this book? Shall I sit silent while the school committee dismisses an unpopular teacher? Shall this meeting take place in a local hall or on a vacant lot? Shall I vote against a man because some Senator calls him subversive? Am I reading both sides of a controversy? Those are questions presented to common or garden people all the time, and the way they are answered can give us more freedom or less.

" And it is very fruitful to keep discussing, in season and out of season, the great advantages of open discussion. Of all the arguments in favor of freedom of speech, the strongest of all (I have come to think) is that it gives us a better country to live in, with fewer suspicions, animosities, informers, heresy trials, and more scope for initiative and originality.

" A people gets sooner or later as much freedom as it wants. This want is partly created by prophets on or off the bench, but partly by constant discussion from plain citizens like us. The best safeguard against inroads on freedom of speech lies in the ferment in the thoughts of the young and of those who will not let themselves grow old." (Chafee, The Blessings of Liberty, p. 101 [J. B. Lippincott Co., 1956].)

Comparison between two cases originating in New York (*Kunz* v. *New York*, 340 U. S. 290 and *Feiner* v. *New York*, 340 U. S. 315) marks out the zealous protection given to the proper exercise of the right to speak — even unpopular views — without a permit (*Kunz* v. *New York*, *supra*) as against a speech which referred to the President of the United States as a '' bum '', the Syracuse Mayor as a '' champagne sipping bum '', the American Legion as '' Nazi Gestapo Agents '', and where the arresting officer stepped in to prevent a fight as there were angry mutterings and pushing in the crowd. (*Feiner* v. *New York*, *supra*.) In *Feiner*, the defendant (as in the cases here) ignored two requests by the officer to stop speaking. His conviction for disorderly conduct was affirmed as not an invasion of his right to speak.

Constitutional regulation of street assemblies and speeches is specifically grounded on preservation of the public peace and of safe travel. Thus, it has been said: '' Control of speeches made in streets and parks draws on still different considerations — protection of the public peace and of the primary uses of travel and recreation for which streets and parks exist ''. (Concurring opinion of FRANKFURTER, J., *Niemotko* v. *Maryland*, *supra*, p. 279.) Indeed, section 2092 of the Penal Law provides: '' § 2092. Unlawful assemblies: Whenever three or more persons:

* * *

'' 2. Assemble with intent to carry out any purpose in such a manner as to *disturb the public peace;*

* * *

'' Such an assembly is unlawful, and every person participating therein by his presence, aid or instigation, is guilty of a misdemeanor.'' (Emphasis added.)

The Legislature fully recognizing the essential values to be given freedom of speech cautioned that this section read as follows: '' But this section shall not be so construed as to prevent the *peaceable* assembling of persons for lawful purposes of protest or petition.'' (Penal Law, § 2092; emphasis added.)

Initially, therefore, the defendants properly assembled to air their views protesting the resumption of testing nuclear weapons. But, upon the conclusion of the rally, that meeting originally lawful, took on unlawful activities plainly in breach of the peace. (See Penal Law, § 2094.)

As to the charge under section 1851 of the Penal Law an unusual defense is asserted. It is claimed that the interference,

resistance, delay or obstruction must be that of a third person and not of the defendant.

A search of the decided cases reveals none touching upon this defense, although the court has been informed that some Magistrates have so construed the section. Section 1851 is as follows: "Resisting public officer in the discharge of his duty. A person who, in any case or under any circumstances not otherwise specially provided for, wilfully resists, delays, or obstructs a public officer in discharging, or attempting to discharge, a duty of his office, is guilty of a misdemeanor."

There is nothing in this section which supports *in haec verba* the claim of the defendants. It appears to the contrary that such a claim would be limiting the impact of the statute in the face of very clear language.

The court finds that these defendants willfully engaged in resisting police officers who were properly exercising their duties. Passive resistance is nevertheless resistance. To interfere and obstruct and delay within section 1851 of the Penal Law does not and need not require active resistance and force by the defendants. "There could exist, on the other hand, circumstances where a mere refusal to act alone might become a resistance or obstruction to a public officer in the performance of duty, or so a jury could find." (*People* v. *Fidler*, 280 App. Div. 698, 704.)

The arrested party has a duty to submit to a lawful and proper arrest. This is manifest from the cases which hold that a conviction under section 1851 of the Penal Law (*People* v. *Richter*, 265 App Div. 767, affd. 291 N. Y. 161; *People* v. *Hill*, 131 Misc. 521) will not lie where the arrest is unlawful. In those cases, the defendant had the right to resist an *unlawful* arrest. But nowhere is there a suggestion that the statute is limited to interference by third parties in the lawful arrest of another.

This court wishes to make abundantly clear that abuse of the police in situations such as here described is disgraceful conduct, violative of the obligations and duties of citizenship. The claim of police brutality which has been given prominence in the press is utterly without foundation. Breach of the peace with its concurrent infringement upon the rights of fellow citizens cannot acquire immunity because the prior inception of the activity was a proper exercise of the right of assembly and freedom of speech. Assault upon or conduct which has a normal tendency to incite others to assault and to interfere with the exercise of police duties by police officers (*Feiner* v. *New York, supra*) likewise can acquire no immunity because of a correctly initiated constitutional activity.

These defendants, because of their beliefs had a right to assemble and to inform fellow citizens of their views. But they had no right upon the completion of that proper activity to engage willfully in conduct, regardless of how laudatory their motives may be, which led to the display described in this record. After the arrests had been made, the conduct of the defendants constituted that type of resistance, delay and interference which is covered by section 1851. The People have adduced sufficient evidence as warrants that these defendants be held for trial by the Court of Special Sessions.

Upon the disorderly conduct charge, all motions are denied and the defendants are found guilty as charged.

As to the charge under section 1851 of the Penal Law all motions of the defendants are denied and the defendants are held to answer the charges in the Court of Special Sessions.