Burke, J. (dissenting).
On March 4, 1966, the Attorney General of the United States announced that his office was investigating the DuBois Club to determine whether it Avas a Communist organization. The folloAving day, a press conference was held at the Brooklyn chapter of the club, located at 621 Vanderbilt Avenue, to reply to the Attorney General’s statement. Eric Eisenberg, then 23 and a staff member of the New York City chapter of the club, was present at the conference. By the time it concluded, shortly after three o ’clock, a crowd had gathered outside consisting primarily of neighbors Avishing to express their dislike for the club. At this time, police draAvn from two local precincts ordered the members to leave their *102 club as soon as possible — well aware that this was the easiest way to disperse the crowd.
One of the first to leave was David Barkin, who, with four friends, walked to his car, which was parked around the corner on St. Mark’s Avenue. After these youths were in the car, garbage cans were thrown at them by members of the crowd. The police quickly restored order, and then removed the boys from the car and searched them preparatory to their arrest. This commotion caused many of the people still on Vanderbilt Avenue to run to St. Mark’s Avenue. Eisenberg was on the club steps when he 'first realized a disturbance was going on around the corner. By the time he reached the car on St. Mark’s Avenue, the police had complete control of the crowd. Informed that the garbage throwing incident could not have been the fault of these youths since they were in the car when the outburst occurred, he approached Officer Pollino who was handcuffing Barkin, and, according to the officer’s own testimony, stated: “ I don’t know why you are doing this. You can’t arrest them. They didn’t do anything.” The officer further testified that, in the course of this inquiry, Eisenberg grabbed him by the arm and spun him around. In addition, he said that the defendant immediately thereafter laid his hands on him a second time, turning him in a “ half spin ”, No attempt was made by any of the other officers then present to arrest the defendant for his conduct, nor did Officer Pollino request them to make the arrest. At least two of the cameramen covering the press conference, also being attracted by the commotion on St. Mark’s Avenue, were able to film this confrontation between Officer Pollino and the defendant.
A short time later, Officer Pollino observed the defendant grappling with three policemen in front of the DuBois Club on Vanderbilt Avenue. At this point, Pollino arrested him, charging him with resisting a public officer in the discharge of his duties (former Penal Law, § 1851), because of his activities on St. Mark’s Avenue and with disorderly conduct (former Penal Law, § 722, subd. 2), arising from his struggle with the police on Vanderbilt Avenue. At the trial, at which some of the film referred to above was introduced, the appellant was convicted only under the former charge — i.e., resisting an officer in the discharge of his duties. No opinion was written. His *103 appeal to the Appellate Term, Second Department, resulted in an order unanimously affirming his conviction, again without opinion. The appeal is here by permission.
In substance, section 1851 makes it a misdemeanor for one to willfully resist, obstruct or delay an officer in discharging or attempting to discharge a duty of his office. Officer Pollino, in the information, stated that the defendant did “ wilfully and unlawfully violently push and pull ” him while performing a duty of his office. At the trial, Pollino’s testimony was verified by two fellow officers and a civilian who, on cross-examination, admitted that he had a dislike for the DuBois Club. While other witnesses were called, their testimony did not relate to the incident on St. Mark’s Avenue.
Defendant, in his own behalf, testified that he did in fact approach Officer Pollino twice on St. Mark’s Avenue and, while he was not certain, admitted that he might have touched his arm the second time. Regarding the conversations between the officer and himself, he testified that he merely inquired as to the basis for the arrest. After two futile inquiries, he left with the idea of securing counsel for the boys. This part of his testimony was not disputed. Eisenberg then denied that he either spun the officer around or otherwise violently pushed or pulled him. In this regard, his testimony was substantiated both by other witnesses and by the film segments referred to above. In addition, 43 still photographs — enlargements of the most critical frames in the film — were submitted to the court, vividly portraying the sequence of events during-which, according to the officer’s testimony, the defendant resisted him while he was discharging his duties. They also lend credence to the defendant’s testimony.
The majority has found the record in this case — containing 229 pages of conflicting and inconclusive testimony supplied by interested witnesses — sufficient to sustain the defendant’s conviction. An objective account of the occurrence, supplied by the continuous filming of the events in question, flatly contradicts their determination. Stated otherwise, the evidence that was presented at the trial is, in our opinion, incredible as a matter of law, to sustain the conviction of this defendant. The film, viewed by this court, presents an accurate record of the events which, according to the majority, constitute the crime *104 of willfully interfering with an officer in the performance of his duty. While the film and photographs are not conclusive, nevertheless, the cumulative pictorial evidence both supplies deficiencies existing in Officer Pollino’s testimony and does substantial damage to it. Thus, Officer Pollino testified that he did not know how many officers were present when he was handcuffing Barkin. The film and pictures show that at least seven other officers were there at that time, who were not engaged in any discernible activity. Also, the officer testified that the defendant grabbed him and spun him around, while he was performing this act. (His information described it as a violent act on defendant’s part.) There is not one photograph showing that the defendant either grabbed or spun the officer. Certain photographs do show that Officer Pollino—while applying the handcuffs — did in fact turn his head to the right on two occasions to observe the defendant. However, the only hand visible that would cause him to turn from force or pressure belonged to a fellow patrolman, as evidenced by his uniform sleeve. The film also confirms defendant’s testimony. As noted above, the testimony in support of the officer was furnished by two fellow patrolmen and a civilian who admitted a dislike for the DuBois Club. In like manner, the witnesses appearing on behalf of the defendant were members of the club. For all these reasons, the only conclusion to be drawn from the record is that there was in fact no interference.
The majority, however, would discount this film because of a stipulation by the parties that it was cut and spliced. As the record indicates, the photographer who filmed these events covered the DuBois Club conference from two o’clock until three forty-five in the afternoon. Judicial expediency alone required that the film be cut and spliced before being introduced at the trial. The majority would infer from this stipulation that the critical portions of the film were also cut and spliced. The stipulation, as found in the record, does not sustain this position, since it merely provided that the entire film segment would not be shown. It is noteworthy that the majority — although it viewed the film — does not contend that it failed to present what appeared to be a continuous, uninterrupted account of the events recorded. Bather, they have distorted the stipula *105 tion’s applicability, thereby discarding the film’s impartial account of the facts involved.
The majority also discredits the film because “ there was no testimony elicited upon the trial as to whether the events depicted in this television tape represented a complete pictorial record of the facts and circumstances leading to the appellant’s arrest.” In this regard, the arresting officer testified that, to the best of his recollection, the film might have been taken either before or after the events for which he arrested the defendant. Undeniably, he was the only person who could state whether the film depicted the “ criminal act ”. At an earlier point in the trial, however, this officer positively stated that he was handcuffing one David Barkin at the time of the interference. Indeed, it is essential to this case that the officer was performing some duty at the time of the interference.
The film shows Barkin being taken from the car, it shows Officer Pollino arresting him, and it shows the defendant coming up to the officer to remonstrate. In short, the film shows the incident which is the basis of this case; and establishes that the officer’s recollection was erroneous. Undaunted, the majority has predicated its affirmance on his recollection.
Additionally, since the record is totally devoid of proof that the defendant (assuming only for purposes of the following paragraphs that he did in fact interfere) was willfully resisting, delaying or obstructing the officer, we have a further ground for reversal. There is no testimony which will serve as a basis for supplying this element of the offense involved herein, nor has the majority enlightened us as to how it resolved this problem.
The word ‘ ‘ wilful ’ ’ is present with some frequency in criminal laws. In United States v. Bruce (33 F. R. D. 133 [N. D., Miss.]) for example, the court was reviewing a conviction under section 1509 of title 18 of the United States Code — willfully obstructing, impeding and interfering with a United States Marshal as he was performing his duties. The court stated in part (p. 135): “ the word ‘ wilful ’ means that the forbidden act is done deliberately and with knowledge. McBride v. United States, 225 F. 2d 249, 253-255 (5 Cir., 1955), certiorari denied 350 U. S. 934 ’ ’. Our own courts have spoken in similar terms *106 (e.g., People v. Broady, 5 N Y 2d 500; People v. Cummings, 29 Misc 2d 545).
With the enactment of the present Penal Law, various sections dealing with resistance to governmental functions and governmental officers were consolidated in section 195.05 which provides in part that it shall be a Class A misdemeanor to intentionally obstruct, impair or pervert the administration of law. This statute, according to its legislative history, replaces without modification its predecessor — section 1851. Consequently, the definition of the word “ Intentionally ”, as set forth in section 15.05 of the new law, is pertinent — “ A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct.”
In light of the traditional meaning accorded the word willful, and aware of the present statutory language, it is necessary that it be shown that the defendant did more than merely touch the officer while asking him questions, before he may be convicted of a violation of section 1851. (See 1 Burdick, Law of Crime, § 285; Marks and Paperno, Criminal Law in New York, § 34.) Accordingly, it must be shown that the defendant intended to interfere with the arrest of Barkin. (See State v. Knudson, 27 S. D. 400, wherein a conviction in an analogous situation was reversed, since the act involved was found not to be willful.) The only evidence in the record which gives any indication of whether the defendant’s act was willful is testimony by an interested witness that, after inquiring as to the reason for the arrest, Eisenberg departed to retain an attorney for these youths. Under such circumstances, a conviction here is tantamount to holding that an individual has no right to inquire as to the validity of an arrest.
Concededly, the circumstances under which an act is performed may sometimes permit an inference of the willfulness of an act without further proof. For example, in People v. Knight (35 Misc 2d 216), the defendant refused to obey the orders of a policeman and instead laid down on the sidewalk. More recently, in People v. Martinez (43 Misc 2d 94), the defendant refused to voluntarily leave police headquarters. This, however, is not such a case.
*107 For each of these reasons, the defendant’s conviction should be reversed, the fines paid remitted and the information dismissed.
Chief Judge Fuld and Judges Scileppi, Bergan and Keating concur with Judge Jasen ; Judge Burke dissents and votes to dismiss the information in an opinion in which Judge Breitel concurs.
Judgment affirmed.