THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. KENNETH E. FIDLER, NATHAN A. BROOME, GEORGE WILMOT, FRED LARKIN, DOUGLAS L. FIDLER and HARRY BRINKERHOFF, Appellants.

Third Department, November 17, 1952.

*Robert E. Fischer, District Attorney (Mahlon H. Card* and *Frank J. Ondrusek* of counsel), for respondent.

*F. Sydney Hand* for appellants.

BERGAN, J. Defendants have been convicted by a jury upon indictments charging them with violation of section 1851 of the Penal Law, a statute described in its section heading as " Resisting public officer in the discharge of his duty ". We are required to decide whether the proof is sufficient to give firm foundation

as a matter of law to the verdict, and for this we take at its optimum truth and value the case presented by the People.

It thus must be deemed established factually that on September 15, 1949, State police observed on a highway five trucks owned by defendant Kenneth E. Fidler and each driven by one of the other defendants who were his employees; that the trucks were each heavily loaded with crushed stone " Heaped right up to the truck sideboards. Then a big Heap on top of that "; that the same trucks similarly loaded had been found overweight two weeks before.

The police stopped the trucks and told the drivers to drive them on a portable scale. The drivers refused to do this; took the keys out of the ignition switches and locked some of the doors of the cabs; refused to turn the keys over to the police on request. The owner Fidler, who came in response to a phone call, was requested to turn over the keys so the trucks could be weighed; he refused to do this or to direct his drivers to turn over the keys or to drive the trucks on the scale. When the trucks were weighed by the police by a process of jacking them up they were found to be overweight.

A statute requires the State police to inspect motor vehicles. This is section 69 of the Vehicle and Traffic Law, which provides that the Superintendent of State Police " shall cause inspection to be made " of " the " vehicles " operating on the public highways ". The purpose of the inspection is stated in the same section and sentence. It is " to detect " inadequacy of equipment, overloading and other violations of law. Thus the duty of " inspection " of vehicles devolves upon the State police in the course of their work on the highways, since this necessarily would be the way the Legislature intended the Superintendent would " cause inspection to be made ".

There would seem to exist a difference in operative constitutional principle between the right of the State to authorize the police to " inspect " a man's house or his person and its right to authorize the police to " inspect " his automobile as to its operation, though the legal effect of " inspect " in this sense is scarcely distinguishable from " search ".

When the State provides a public facility for private use and the use is by mechanical equipment, dangerous if defective, the right of public authority to examine the equipment as an incident to such a use would seem incontestable. A rule of law must be adaptable to important changes in the way people live and act, or collapse under the weight of need and be replaced by something else.

The cloak of the right to privacy extends generally to an automobile; but it does not protect the driver against an inspection to determine if there is immediate danger in the very thing which the citizen has placed in present operation on the public way. A defective vehicle on a teeming traffic lane may require instant intervention of public power and that kind of intervention on the highway is not an invasion of privacy in truth or in the sense in which the draftsmen of constitutional language had of the protection they were affording against unreasonable searches.

Many other limitations upon the freedom of action and the privacy of a man when he decides to take his car out on a public highway have been imposed and have won legal acceptance. He must stop at red lights; he must observe signs; he must obey the reasonable traffic directions of a police officer; he must produce his registration certificate when a policeman asks for it and give " all information required concerning his license to operate ", and even sign his name for comparison. (Vehicle and Traffic Law, § 11, subd. 4.)

Affirmative action of many kinds has been required by public authority. The income taxpayer is required to prepare and fill out his own income tax return and affirmatively disclose his private business affairs. A man may be required to testify in a court on matters which he feels to be his own concern; and this requirement for affirmative action becomes especially well accepted when the citizen uses public facilities.

The power of the Legislature to require the driver of a vehicle using the public ways to place it on a public scale to test its weight or to take it to a public mechanic to test its mechanical equipment could scarcely be denied in the light of constitutional and legal practices as presently evolved.

But the statute upon which the charge before us is based does not in terms require the driver to act affirmatively; it imposes the duty, rather, on the police to inspect the vehicle and the central problem here becomes whether what these defendants did amounted to a resistance or an obstruction of the performance of this duty.

If the power of the police to inspect the vehicle be thus admitted, as we think it must be, then one aspect of the constitutional problem which is on the perimeter of this case solves itself. The question that usually has arisen in New York on the criminal charge of interfering with an officer in the performance of duty has grown out of a resistance by a citizen to a search or a seizure, and the court inquired, in effect, whether in making the search or the seizure there was a legal trespass.

Two leading cases will serve to illustrate this. In *People* v. *O'Connor* (257 N. Y. 473 [1931]) the defendant had been arrested by a policeman for driving an automobile while intoxicated and for assault in the third degree. The offenses were not committed in the presence of the arresting officer who also had no warrant. The defendant struggled against a search of his person and for this act was convicted of resisting the officer in the performance of duty under section 1825 of the Penal Law, a statute similar to section 1851. The court held the arrest was not lawful and therefore the resistance to the search was justified and constituted no crime.

In *People* v. *Richter* (265 App. Div. 767 [1943]) inspectors of the department of markets of the city of New York, suspecting that a sign advertising a diamond ring was false and thus a violation of the Penal Law, attempted to keep in their possession the ring and the sign which had been handed to them by a sales clerk. The owner of the store tried by force to get the ring and sign back and was convicted of violating section 1851. The Appellate Division reversed on the ground the seizure was unlawful when made by the inspectors and hence defendant was entitled to resist it.

The ground of invalidity, in the view there taken by the Appellate Division, was that at the time of taking the ring and sign the inspectors had no proof there was then a violation of the statute and had not arrested the owner for such a violation, although it was later established the ring had been falsely labeled. Such a seizure the court felt would be valid only after there had been a lawful arrest. When there has been an arrest lawfully made the right to search the accused and to seize material evidence is undoubted under New York practice. Thus, where a man was lawfully arrested for arson it was held proper for the police to search him and retain two letters found on his person material to the prosecution. (*People* v. *Chiagles,* 237 N. Y. 193.)

In 1928 the County Court of Lewis County in *People* v. *Hill* (131 Misc. 521) held that it was not a violation of section 1851 for the defendant to resist a general search of his automobile by police looking for Conservation Law violations and without reasonable ground for believing he had committed a crime.

But if the right of the Legislature to authorize the police to inspect private equipment used on public highways in respect of its safety is once admitted, as we think we have demonstrated it must be, such an inspection when undertaken is not a wrongful

invasion of privacy and it is not an unlawful trespass in the sense in which the search of the person of the driver of the vehicle in the *O'Connor* case (*supra*), the search of the car for Conservation Law violation in the *Hill* case (*supra*), or the seizure of the diamond ring in the *Richter* case (*supra*) were regarded by the respective courts which heard those cases. The statute and the inspection under it both are within the frame of valid public power.

The legislative right to authorize the inspection existed whether or not evidence of overweight or defective equipment was disclosed. That is what the Legislature did. It did not require inspection of cars in relation to safety which police had ground to believe unsafe; it authorized them to examine all motor vehicles. It is " the " motor vehicles operating on " the " highways which are to be inspected.

We must discriminate carefully to see the difference between a right to search the person or vehicle after a valid arrest for a crime based on probable cause resting on one theory of law justifying intrusion into privacy; and a right to inspect the safety of a vehicle resting on quite a different theory of law and justifying the examination of private property on the use to which the property is put in its effect on the public safety.

The purpose of the inspection, as the statute also says, is to detect violations; but it is quite clear that the duty to inspect does not hang on the existence of a defect or violation to be revealed by the inspection. A duty to inspect " the " vehicle on " the " highways with the right to perform the duty existing only where a defect actually existed would be impractical of execution; but in any event that is not the way the Legislature prescribed it. A duty to inspect, involving as it does, an examination into " overloading " would carry with it by necessity the right also to weigh the vehicle.

From this we turn to an aspect of the case which may stand on more debatable ground. The Legislature, as we have stated, could within the frame of its power in establishing safe practices on the highways which it has built for the public, have required the operators of vehicles to place them on scales and weigh them under public direction, and could have imposed criminal responsibility or traffic infraction status as a consequence of refusal. It has not, however, commanded by express statutory language any affirmative act by the driver in support of the inspection.

There would be times when a citizen might stand firm against doing any affirmative act of uncovering a crime under the consti-

tutional protection against self incrimination which protects against a disclosure by action as well as a verbal disclosure. A good discussion of this is in *Boyd* v. *United States* (116 U. S. 616) in which the close points of reference between searches and seizures and requirements for self incrimination are observed. But a refusal on constitutional grounds to do an affirmative, self-incriminatory act would have to be plainly and clearly asserted on those grounds with the risk that a court might later say the grounds were untenable and inappropriate and the refusal to obey the command of a statute a valid basis for prosecution.

It is unnecessary to do more in the case before us than to say that the refusal to drive the trucks on the scales was not itself a violation of any specified command of a statute and had there been a naked refusal to act, occurring in isolation, this alone might not have been sufficient to constitute a violation of section 1851. There could exist, on the other hand, circumstances where a mere refusal to act alone might become a resistance or obstruction to a public officer in the performance of duty, or so a jury could find.

But the refusal to drive the trucks on the scales, together with the shutting off of the motors; the removal and retention of the ignition keys and the locking of some of the cab doors, in their totality presented a factual pattern of events upon which a jury might be warranted in finding resistance and obstruction to the performance of public duty.

This is the accusation and we think it was proper to send it to the jury. The case against the owner Fidler is different, and perhaps weaker, than the cases against the driver defendants; but the owner came into the situation voluntarily and undertook to participate in events which the jury might say, under separate and careful instructions in his case, also constituted an interference and obstruction of the duty the police were attempting to perform.

The case as a whole required careful judicial supervision and adequate instructions. This is not the kind of case that has its needs satisfied by a routine charge to the jury. The problem is whether all the acts together, refusal to drive on the scales, plus taking the keys out of the ignition and retaining them, plus the locking of some of the cab doors, are to be regarded factually by the jury as being obstruction and interference of the duty of the police to inspect the vehicles.

The Judge in his instructions read the text of section 1851 as relating to "The charge here". He then said: "There is a

section which provides that no person shall fail, neglect or refuse to comply with any reasonable order of a peace officer engaged in the direction of traffic ''. He continued: '' That seems rather clear, but to enlarge on that, let me say that the peace officer on the corner has a right to say stop and it is your duty to stop. He also has the right to tell you when you can go and then it is your duty to go where he directs. I think that is all I need to say about that.'' He later seemed to draw a distinction between the State police and such traffic officers as peace officers.

The question was not one of '' disobeying '' a traffic officer under subdivision 6 of section 88 of the Vehicle and Traffic Law, which deals with a refusal to comply with a reasonable order of a policeman in the regulation of traffic. Defendants were under no duty to '' obey ''; their duty was not to obstruct the public officer. They were not being given a traffic order. The difference is difficult for laymen trying facts, but difficult as it is, it was their duty to understand it and the duty of the Judge to see in his instructions that it was stated so clearly as to be understood.

We do not see how the jury could have drawn any other conclusion from the sequence and interposition of the traffic direction phase of the Judge's charge than that they were free to convict for naked disobedience of the direction to drive on the scales for weighing in the same way that they would be free to convict for failing to stop to allow pedestrians to cross a street when directed by a traffic policeman. There was an indissoluble merger of the two offenses in the instructions to the jury and one had no application at all to the case. In other parts of the instructions this merger was reiterated.

The effect of this error upon the verdict could not be avoided and cannot be disregarded. When counsel for appellants took exception to the inclusion of the traffic direction phase of the charge the court seemed to agree with counsel, but he immediately reiterated the part that was complained of and erroneous. He first said: '' This is not a question here of a traffic violation, a violation of a traffic law ''. But, he continued, '' it is a charge that they refused to obey the officers '' which, of course, was just what it was not and this was a misleading and confusing final summary of the jury's problem.

The judgments should be reversed and a new trial ordered.

Foster, P. J., Brewster and Coon, JJ., concur; Heffernan, J., taking no part.

Judgments reversed, on the law and facts, and a new trial ordered.