Chief Judge Breitel.
Defendant was convicted in County Court, after a guilty plea, of attempted criminal possession of a dangerous drug in the fourth degree (Penal Law, § 220.15, repealed by L 1973, ch 276, § 18). He received five years’ probation. The Appellate Division affirmed and defendant appeals.
The issue is whether a police officer may stop an automobile, arbitrarily chosen from the stream of traffic on a public highway only because of the unusual but irrelevant appearance of the vehicle, solely to examine the motorist’s license and registration, or to inspect the vehicle for possible equipment violations.
There should be a reversal. A single automobile traveling on a public highway may be stopped for a "routine traffic check” when a police officer reasonably suspects a violation of the Vehicle and Traffic-Law. Absent reasonable suspicion of a vehicle violation, a "routine traffic check” to determine *415 whether or not a vehicle is being operated in compliance with the Vehicle and Traffic Law is permissible only when conducted according to nonarbitrary, nondiscriminatory, uniform procedures for detecting violations. It should be emphasized that, in the context of a motor vehicle inspection "stop”, the degree of suspicion required to justify the stop is minimal. Nothing like probable cause as that term is used in the criminal law is required.
On August 25, 1972, defendant was operating his 1949 Ford on Route 96A in Seneca County. The automobile, despite its vintage, was in apparent excellent condition, and had no external signs of defective equipment. Defendant was not speeding, nor was he violating any other traffic law.
Although he had no information concerning defendant or his vehicle, a State Trooper decided to make what he later described as a "routine traffic check” of the Ford. The trooper switched on his red signal lights and flasher and caused defendant to pull over to the side of the road.
Defendant alighted, leaving the driver’s side door open, and, upon the trooper’s request, produced his operator’s license and vehicle registration. The trooper walked around the front of the Ford to the passenger side, inspecting for possible equipment violations. When he returned to the driver’s side, the trooper saw an unused bronze wire screen, about the size of a nickel coin, lying on the rug between the front seat and the door frame. He asked defendant if he could examine the screen, and, upon receiving defendant’s consent, reached into the automobile to pick it up. As he did so, he detected the aroma of marijuana.
The trooper then noticed an open pouch on the front seat and asked defendant if he could examine it. Defendant assented. Inside the pouch, he found a smoker’s pipe, the burnt end of a marijuana cigarette, and a small quantity of loose marijuana. Defendant was arrested and taken to the trooper substation, where he later made admissions.
Defendant was subsequently indicted for criminal possession of a dangerous drug in the third degree, and initially pleaded not guilty. After a hearing, defendant’s motion to suppress the real evidence and the admissions was denied. The suppression court apparently assumed that the trooper was unqualifiedly entitled to stop defendant’s automobile. Upon finding probable cause to search the vehicle, as distinguished from the mere stop, it denied suppression. Defendant then pleaded guilty to a *416 reduced charge of attempted criminal possession of a dangerous drug in the fourth degree.
The problem raised by the present appeal embraces two distinct aspects or practices by the police in the stopping of moving automobiles for legitimate police purposes under the Vehicle and Traffic Law. The one, for which there must be some valid reason, however slight, is the occasion for singling out a particular automobile and its operator for a stop and an inspection to determine compliance with the Vehicle and Traffic Law. The other is to conduct a routine check of automobiles by some nonarbitrary, systematic procedure to verify compliance with the law. This may be done randomly, but even then by some system or uniform procedure, and not gratuitously or by individually discriminatory selection. It may also be done by uniform inspection of all vehicles at a roadblock or checkpoint. It is assumed that any other kind of stopping without cause or reason or by arbitrary caprice or curiosity is an impermissible intrusion on the freedom of movement. The difficulty is the separation of the permissible from the impermissible without unduly frustrating legitimate police purposes or encroaching unduly on the rights of individuals even as motorists.
Subdivision 4 of section 401 of the Vehicle and Traffic Law requires any motorist to produce, upon demand of a police officer, the automobile registration certificate, and all information required concerning his license to operate (see, also, Vehicle and Traffic Law, § 507, subd 2, which makes failure to exhibit a valid operator’s license to a policeman presumptive evidence that the motorist is not duly licensed).
By necessary implication, in many of the cases the statute has been read to authorize stops for "routine traffic checks”. In fact, ample basis for reasonable suspicion of criminal activity, or even probable cause to arrest, could have been found to justify the stop without reliance upon the statute (see People v Denti, 44 AD2d 44, 45-46 [police officers’ suspicions aroused by defendant’s automobile cruising erratically in "circles” in high-crime area]; People v Merola, 30 AD2d 963, 964 [police officers, responding to "burglary in progress” call, observed man running toward vehicle which had motor running; vehicle pulled away to leave and was stopped]; People v Hoffman, 24 AD2d 497, 498 [defendant’s activities in the operation of an automobile at 4 o’clock in the morning termed "suspicious”]; but cf. People v Baer, 37 AD2d 150, 152 and *417 People v Dozier, 52 Misc 2d 631, 632 [involving stops arguably treatable as not arbitrary but assuming that a traffic stop needs no basis whatsoever]; see, also, People v Scianno, 20 AD2d 919, 920, which evidently assumed an absolute right to stop motor vehicles).
Section 390 of the Vehicle and Traffic Law is more pertinent to the inquiry. The statute provides that: "The superintendent of state police shall cause inspection to be made of the motor vehicles and motorcycles operating on the public highways to detect inadequacy of equipment, overloading and other violations of the law governing the use of the public highways by motor vehicles and motorcycles.”
True, the statute has been read as authorizing stops for "routine traffic checks” without further elaboration (see People v Rowell; 27 NY2d 691; People v Fidler, 280 App Div 698, 700-703). Significantly, neither Rowell nor Fidler need have relied upon the statute to uphold the stops. In the Rowell case, defendant conceded a limited right of the police to stop. In the Fidler case, the police had ample reason to suspect violations of the Vehicle and Traffic Law. Five trucks heavily loaded with crushed stone were observed proceeding along the highway. The same trucks had been found overweight just two weeks before. The trucks were stopped and the operators were ordered to drive onto a portable scale to check the weight (280 App Div, at p 700). Despite the court’s sweeping language upholding under the statute, without further justification, inspection stops of vehicles using the highway, this was no stop for a "routine traffic check”.
Cases permitting motor vehicle inspection stops, in the absence of probable cause or suspicion, have relied principally upon the right of the police to inspect motor vehicles as incident to the privilege to use the public highway (see People v Fidler, 280 App Div 698, 700, supra; cf. People v Battle, 12 NY2d 866). That right of inspection is not in dispute; it is the precondition to the exercise of that right which is in issue. Labeling the use of the public highway as a "privilege” is not dispositive of whether any stop, however arbitrary, is permissible.
Whatever the validity of Fidler in its day, the concept that constitutional rights turn upon whether a governmental benefit is characterized as a "right” or as a "privilege” has been rejected (Graham v Richardson, 403 US 365, 374; see Bell v Burson, 402 US 535, 539; Goldberg v Kelly, 397 US 254, 262; *418 Shapiro v Thompson, 394 US 618, 627 n 6; Sherbert v Verner, 374 US 398, 404; People v Samuel, 29 NY2d 252, 258; People ex rel. Menechino v Warden, 27 NY2d 376, 384, n 6). Hence, section 390 may not be read to authorize a stop by the shibboleth of a "routine traffic check”, if such a stop is gratuitous, arbitrary, and without justification or excuse to support even that limited intrusion on movement on the highways.
In determining the constitutional scope of a stop for a "routine traffic check”, the threshold inquiry is whether even such a stop is a seizure within the meaning of constitutional limitations. By arguable analogy, the rationale of Terry v Ohio (392 US 1, 16) is applicable. There the court stated with respect to the "stop” of a person: "It is quite plain that the Fourth Amendment governs 'seizures’ of the person which do not eventuate in a trip to the station house and prosecution for crime * * * It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized’ that person”. The court (p 17) noted that to distinguish between "stop” and "seizure” could serve only "to isolate from constitutional scrutiny the initial stages of the contact between policeman and the citizen”.
Although the encounter treated in the Terry case took place between a policeman and pedestrians on a public sidewalk, a similar interpretation should accommodate the motorist who is "accosted” on the public highway by the flashing lights of a patrol car and "restrained” by a police officer while a document or equipment check is conducted (cf. People v Cantor, 36 NY2d 106). Indeed, relying upon the Terry case, it has been held that a stop of an automobile as for a "routine traffic check” is a seizure within constitutional limitations (see Commonwealth v Swanger, 453 Pa 107, 111; cf. United States v Mallides, 473 F2d 859, 861; United States v Nicholas, 448 F2d 622, 624, n 3; Carpenter v Sigler, 419 F2d 169, 171; see, generally, Note, Automobile License Checks and the Fourth Amendment, 60 Va L Rev 666, 680-682; Note, Nonarrest Automobile Stops: Unconstitutional Seizures of the Person, 25 Stan L Rev 865, 871-872; Comment, Commonwealth v Swanger—Spot Checks Eliminated, 47 Temple LQ 640, 651-652; but see State v Fish, 280 Minn 163, 166-167).
Thus, since the stop of defendant’s automobile was a limited seizure within the meaning of constitutional limitations, if it were unreasonable, the subsequent discoveries of the screen *419 and marijuana would constitute derivative evidence obtained by an illegal seizure and therefore should have been suppressed (see People v Cantor, 36 NY2d 106, supra).
The reasonableness of a stop for a permissible “routine traffic check” must be measured by standards which require a balancing of the State and individual interests involved (Terry v Ohio, 392 US 1, 20-21, supra; Camara v Municipal Ct., 387 US 523, 536-537; People v Cantor, 36 NY2d 106, supra; People v Kuhn, 33 NY2d 203, 209).
On one hand, the State has a vital and compelling interest in safety on the public highways (see Executive Law, § 330). Moreover, rioncompliance with licensing and registration requirements, as well as many equipment violations, are not effectively detectable or deterrable without some form of on-the-spot inspection procedure. On the other hand, however, a motorist has the general right to be free from arbitrary State intrusion on his freedom of movement even in an automobile (see Brinegar v United States, 338 US 160, 177 ["the citizen who has given no good cause for believing he is engaged in (criminal) activity is entitled to proceed on his way without interference”]; see, also, Terry v Ohio, 392 US 1, 15, 21, supra).
The proper balance of these competing interests lies in eliminating any arbitrary element in the practice. Section 390 and subdivision 4 of section 401 of the Vehicle and Traffic Law, authorizing the police to inspect motor vehicles on the highway, should be construed to reflect this balance. Where the danger of abuse of discretionary power to intrude upon personal liberty is greatest, discretion must be limited. Thus, an arbitrary stop of a single automobile for a purportedly "routine traffic check” is impermissible unless the police officer reasonably suspects a violation of the Vehicle and Traffic Law.
The analogies are many and provide, in the case of pedestrian stops and in at least one instance of a vehicle statute, dramatic demonstration of the balancing of competing interests presented by the need for legitimate and effective law enforcement, and the control of intrusions on personal freedom of movement (see Adams v Williams, 407 US 143, 146; Terry v Ohio, 392 US 1, 21-22, supra; People v Cantor, 36 NY2d 106, supra; People v Rosemond, 26 NY2d 101, 103-104; People v Rivera, 14 NY2d 441, 445, cert den 379 US 978; compare Vehicle and Traffic Law, § 390 with Cal Vehicle *420 Code, §§ 2804, 2806 and People v Grace, 32 Cal App 3d 447, 451-452 [reasonable belief of. a violation required for inspection check other than at a roadblock]). Indeed, in Pennsylvania an approach quite similar to that taken here was followed (Commonwealth v Swanger, 453 Pa 107, 115, supra [probable cause, based upon specific facts which indicate a violation, required for inspection at other than a roadblock]). The position there taken, however, took the form of requiring as a basis for a "routine” traffic stop what was characterized as probable cause, but which may be no different than the reasonable suspicion suggested earlier as the basis for a "routine” traffic stop (see Note, 60 Va L Rev 666, 679).
It should be emphasized that the factual basis required to support a stop for a "routine traffic check” is minimal. An actual violation of the Vehicle and Traffic Law need not be detectable. For example, an automobile in a general state of dilapidation might properly arouse suspicion of equipment violations. All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity. It is enough if the stop is based upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion” (Terry v Ohio, 392 US 1, 21, supra).
But even aside from permissible stops for specific cause or reasonable suspicion, the interest of the State in insuring highway safety outweighs the minor intrusion caused by nonarbitrary, uniform and systematic inspection. The purpose and effect, of course, is, in a difficult area, not to leave police discretion wholly untrammeled. Hence, stops and inspections at roadblocks, checkpoints, weighing stations, and the like, satisfy constitutional requirements (see Commonwealth v Swanger, 453 Pa 107, 110, n 3, supra [strong intimation that equipment checks may be conducted at a roadblock or other systematic stop]; People v De La Torre, 257 Cal App 2d 162, 164 [pursuant to Cal Vehicle Code, § 2814, equipment checks may be conducted at a roadblock without cause to suspect a violation]).
Defendant Ingle was stopped on the open highway arbitrarily, if not gratuitously. The trooper candidly testified that he had had no reason to stop defendant other than to conduct a "routine traffic check”, as he had no information concerning defendant or his vehicle. His interest was undoubtedly piqued by the antiquity of the 1949 Ford in remarkably excellent *421 condition, but if perchance that was the reason it was not sufficient. Hence, the stop was an illegal seizure of defendant’s automobile and the evidence obtained by that seizure may not be used as evidence against him.
In this entire discussion the concern has been with vehicle stop and vehicle inspection and not the area of search into the vehicle or of its operator or passengers. To those searches, obviously, different and more stringent rules apply (see People v Singleteary, 35 NY2d 528; People v Brosnan, 32 NY2d 254).
Accordingly, the order of the Appellate Division should be reversed, the conviction vacated, the evidence suppressed, and the indictment dismissed.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order reversed, etc.