THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JOHN BB. and STEPHEN CC., Appellants.*

Third Department, June 18, 1981

#### APPEARANCES OF COUNSEL

*David Cohen* for John BB., appellant.

*Kleinman & Rosenberg (Abraham Kleinman* of counsel),
for Stephen CC., appellant.

*Joseph Jaffe, District Attorney (Frank J. Labuda* of
counsel), for respondent.

#### OPINION OF THE COURT

HERLIHY, J.

On December 19, 1979, the New York State Police became
aware that about 40 burglaries of vacant summer cottages
had occurred in the remote, sparsely populated area of the
Anawanda-Tennanah Lake region of Sullivan County.

Investigator Connors undertook a surveillance of the area
on December 21, 1979, commencing with a report at about
6:00 P.M. on that date that a vehicle was observed in the
area. Investigation of that report resulted in a vehicle being
stopped and it being ascertained that the operator was gen-
erally employed as a caretaker of several of the cottages.
Thereafter, the investigator stopped all cars that he found

---

* Names used herein are fictitious for purposes of publication.

in the area and interviewed all people in the area. At about 9:30 P.M., the defendant Stephen CC.'s car approached the investigator's unmarked police car from its rear and after stopping for a few seconds it proceeded past at a slow rate of speed. The investigator radioed in the license plate number for a check on ownership and notified two other policemen in the area to meet him at a specified intersection where he would stop Stephen CC.'s car.

It appears that one of the troopers with a marked police car pulled beside and forward of Stephen CC.'s car with the lights flashing while Connors pulled up close behind the car and the other policeman upon arrival pulled alongside the car.

In response to a demand by Trooper De Rosia for his driver's license and automobile registration, Stephen CC. exited from the vehicle with the requested documents. As he was out of the vehicle with the door open, Connors looked inside with his flashlight and observed a rifle case protruding from under the front seat of the vehicle as well as several flashlights on the vehicle floor. Connors promptly ordered the three passengers out of the vehicle (one of them was defendant John BB.) and then seized the rifle case. When opened, the case revealed a pellet gun.

Stephen CC. was asked where he got the gun and he responded that he had bought it and a pair of speakers from a friend. It was then learned that the speakers were in the trunk of the vehicle. When questioned, the occupants gave conflicting stories of their activities in the area. One said they were joyriding; another said they were returning from Binghamton. The officer knew that a pellet gun had been stolen from one of the nearby burglarized houses. The officer had also seen flashlights in the car, which are often used in burglaries.

Further, when asked about the ownership of the pellet gun, defendant said it and the speakers in the trunk belonged to him but he could not remember the name of the friend who sold them to him. Additionally, the officer also knew that speakers had been among the recently stolen items. The above circumstances, coupled with defendants' proximity to the crime scene and their suspicious stopping

and starting when they saw the unmarked police car, combined to give the policeman probable cause to believe that the speakers in the trunk were fruits of the past burglaries and justified opening the trunk without permission.

Defendants were not formally arrested, but Connors ordered them taken to the barracks and after waiving their *Miranda* rights they submitted to interrogation and eventually confessed to committing several burglaries, admitting that the speakers in the car had been stolen.

After being indicted on charges of several counts of burglary, defendants moved to suppress their confessions and the evidence seized from Stephen CC.'s vehicle at the initial stop on December 21, 1979. Following the denial of that motion, defendants pleaded guilty to reduced charges of attempted burglary, were adjudicated youthful offenders, and now appeal the dismissal of the motion to suppress. Defendant Stephen CC. also questions his sentence as harsh and excessive.

At the outset, the record establishes that both Stephen CC. and John BB. were duly given their *Miranda* warnings before their confessions were made, and upon review there is no basis for concluding that the confessions were the result of physical violence or unwarranted threats. The central issues are the legality of the seizure of evidence from Stephen CC.'s vehicle and the subsequent detention of defendants for the purpose of interrogation.

Defendants contend that the initial stop of Stephen CC.'s vehicle was illegal and invalidates the seizure of the pellet gun and the speakers. The evidence, as developed at the suppression hearing, establishes that the determination of the police to stop Stephen CC.'s vehicle was in accord with a nondiscriminatory uniform procedure adopted to facilitate the acquisition of information which might lead to a resolution of the recent burglaries. As described in the record, the area was too large for ordinary surveillance. It does not appear that the utilization of a mobile or roving road block was unreasonable, and the momentary inconvenience inevitable in police confrontation for the simple governmental purpose of asking names and current activity outweighs the individual's right to privacy and personal security. (Cf.

*People v Adams*, 53 NY2d 1; *People v De Bour*, 40 NY2d 210.)

Defendants' reliance upon the cases of *People v Ingle* (36 NY2d 413) and *People v Sobotker* (43 NY2d 559) to establish illegality is misplaced since in those cases there was no uniform check of all traffic in progress. Nevertheless, the obvious impact of being stopped and blocked on all sides by police vehicles goes somewhat beyond what can be categorized as a minimal confrontation such as the pedestrian incident in *People v De Bour (supra)*. (See *Delaware v Prouse*, 440 US 648.) Upon the present record, the police admitted that initially, if the passengers of the vehicle had not wanted to talk to them, there would be no basis for demanding any information. The demand for the driver's license and registration of the car from defendant Stephen CC. was likewise not in conjunction with any police investigation of use of the highway but was solely for purposes of identification.

Upon balancing the necessity of determining the identity of all current inhabitants of the area as part of the investigation of the burglaries with defendants' right of privacy, the forceful stop of the automobile and initial request for identification is not unreasonable. (Cf. *People v Adams, supra; People v De Bour, supra,* p 215.)

The record leaves no doubt that the rifle case was in plain sight of Investigator Connors and that his seizure of the case and investigation of its contents were reasonable for his own self-protection. The People contend that because the rifle was properly seized and the occupants of the automobile gave conflicting statements, the forcible opening of the vehicle's trunk was authorized. Under such circumstances, there was probable cause and exigent circumstances to warrant such action. (See *People v Kreichman*, 37 NY2d 693; *People v Chestnut*, 43 AD2d 260, affd 36 NY2d 971.) As recently noted by the Court of Appeals: "Detached from the tension and drama of the moment, it is sometimes easy for an appellate court to lose sight of the fact that it is the reasonableness of police action which is the linchpin to analysis of any case arising under the Fourth Amendment." *(People v Adams, supra,* p 11.)

As to the confessions, even if the detention was illegal, the statements would nevertheless be admissible in evidence. As stated in *People v Rogers* (52 NY2d 527, 534-535): "The exclusionary rule exacts a heavy penalty, and although its operation is justified, the exclusion of evidence should be for therapeutic reasons and should not be used as a punitive measure. The application of the exclusionary rule requires a commonsense appraisal of whether the suppression of the challenged evidence will remove in the future the motive for similar improper police conduct. In this analysis, it has never been enough to show that evidence must be suppressed simply because it was discovered subsequent to an illegal arrest; it must in addition be shown that the police exploited the illegal detention in such a way as to establish that it was the detention which produced the challenged statements. In a case such as this, where the trial court is satisfied on sufficient evidence that the required nexus between the detention and the statements is absent, there would be no deterrence and therefore no reason to invoke the exclusionary rule (cf. *Dunaway v New York*, 442 US 200, 218, *supra*)."

Based upon this record, and the particular necessity for the police vigilance, the judgments should be affirmed.

The other contentions of the defendants, including excessiveness of the sentence, have been examined and found to be without merit.

The judgments should be affirmed.

MAHONEY, P. J., MAIN and YESAWICH, JR., JJ., concur with HERLIHY, J.; MIKOLL, J., concurs in the result only.

Judgments affirmed.