[626 NYS2d 103]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ROMULO GIL, Defendant-Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JOSE PENA, Defendant-Respondent.

First Department, May 4, 1995

### APPEARANCES OF COUNSEL

*Darryll A. Buford* of counsel, Bronx *(Daniel S. Ratner* and *Joseph N. Ferdenzi* on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for appellant.

*Elliot H. Fuld* of counsel, Bronx *(Goldstein, Weinstein & Fuld,* attorneys), for defendants-respondents.

### OPINION OF THE COURT

WALLACH, J.

The suppression court's erroneous ruling, in this drug possession case, was based in part on an incomplete finding of facts. The unrefuted testimony in the record reveals that shortly after 9:00 P.M. on a late winter evening in 1992, uniformed Police Sergeant Gildea and Officer Fraiser chased and stopped a livery cab they had just observed running a red light on Fordham Road in the Bronx. Approaching with their weapons holstered, Fraiser went to the driver's side while Gildea took a position outside the passenger side, where he could observe the two occupants in the rear seat.

Defendant Pena, seated on the left side behind the driver, interrupted Fraiser's conversation with the driver and sought to exit the vehicle, offering to show Fraiser identification that he was a college student. The first two times Pena tried to get out, Fraiser asked him to wait until Fraiser had finished speaking with the driver. On the third effort, Fraiser allowed Pena to exit onto the "dark and isolated" road. Pena was acting "a little nervous," stepping farther out into the roadway, so Fraiser asked him to step back near the car. Instead, he kept backing toward the middle of the road before eventually producing an ID card from his wallet. As Fraiser studied the card, Pena suddenly lunged at the officer, knocking him against the police vehicle and onto the ground, before taking off on foot. Pena was soon captured by backup police after hopping a fence and crossing the traffic lanes of the Major Deegan Expressway.

Before Pena's flight, both officers had noticed a large black canvas bag with a drawstring, on the seat between the passengers. As Fraiser was questioning the driver, defendant Gil,

who was seated on the right side in the rear, picked up the bag, which appeared to be heavy, and placed it on his lap. Since Gildea could no longer see Gil's right hand, and now concerned about the possibility of a concealed weapon, he placed his hand on his holstered gun and asked Gil what was in the bag. Gil failed to answer, so Gildea then asked Gil to place his hands on the seat in front of him. Gil ignored two of these requests. As Pena exited the left side of the vehicle, Gildea, concerned that he could not cover Pena and watch Gil at the same time, asked the latter to exit the right side, again questioning him about the bag's contents. Gil, who had also identified himself as a college student, got out, holding the bag, but then turned toward Gildea and suddenly "barreled into" him and tried to push past. Gildea wrestled Gil to the ground and radioed for help, as he spotted his partner running off in pursuit of Pena. The bag fell to the ground. (Fraiser later told the District Attorney that he believed the bag was recovered from the back seat of the car.) At that point, Gildea placed Gil under arrest for harassment, although he was never formally charged with that offense.

The bag contained textbooks and notebooks, a calculator, and "two brick-shaped objects", about 5 inches by 1½ inches, wrapped in opaque brown tape in a manner "commonly used to package narcotics." Later, during the arrest processing at the precinct, Gildea and Fraiser were discussing between themselves whether the confiscated material was heroin or cocaine when, according to Gildea, Gil volunteered that "it was cocaine." Each of the defendants was charged with criminal possession of a controlled substance (two kilograms of cocaine) in the first degree, and resisting arrest.

The hearing court ruled that the police had acted lawfully in stopping the livery cab in the first place, but then suppressed the physical evidence (and the statement flowing from the subsequent arrest) on the ground that nothing following the stop gave the police reason to believe criminal activity was afoot. Since there was no basis for arrest, and the contraband was seized after the arrest, the physical evidence was held inadmissible, as was the "subsequent questioning" which led to Gil's inculpatory utterance.

Every stop, search and seizure must be analyzed in a step-by-step fashion (see, People v De Bour, 40 NY2d 210), in light of the articulable facts, credible objective evidence, and rational inferences that flow therefrom (People v Hicks, 68 NY2d 234, 243). The hearing court correctly found that the initial

stop was not pretextual, but rather was justified upon a clearly apparent violation of the Vehicle and Traffic Law *(see, People v Ingle,* 36 NY2d 413, 419). Once a valid traffic stop is established, security dictates that a police officer has a right to ask the driver or a suspect in a vehicle to alight *(Pennsylvania v Mimms,* 434 US 106, 110). Granted, defendants were neither driver nor suspect at this point. Whether defendants' nervous motions in turning and looking at the approaching police justified such a minimal intrusion is beside the point because the initial approach used by these policemen was only to question the driver. All the police required of the passengers was that they keep their hands in plain view, a not unreasonable request in light of significant statistics on shootings of police during routine vehicular stops *(see, United States v Robinson,* 414 US 218, 234, n 5). And since the risk in such vehicular encounters is the same whether the occupant in question is a driver or a passenger, the police may even order passengers out of a car stopped for a traffic infraction, as a precautionary measure, during questioning of the driver *(People v Robinson,* 74 NY2d 773, *cert denied* 493 US 966; *People v McLaurin,* 70 NY2d 779), even absent a particularized belief that any of the occupants is armed *(People v Rodriguez,* 167 AD2d 122, *lv denied* 77 NY2d 843).

Here, ironically, the police did not initially ask the passengers to alight. The only "intrusion" upon the rear-seat occupants was Gildea's order that Gil keep his hands in plain view. Only after Pena had prevailed upon Fraiser to let him get out on the left side did Gildea direct Gil to get out on the right side. At that precise moment, there were two passengers exiting the car—one at his own insistence, and the other upon the equally valid invitation of the police sergeant. A moment later, the situation rapidly escalated as each policeman was physically struck by the passenger on his side, thus justifying arrests, and the search and seizure incident thereto.

The suppression court, while crediting Fraiser's account of Pena's actions, completely ignored Gildea's unrefuted testimony concerning Gil's effort to push the police sergeant away and flee the moment he exited the vehicle.* This oversight was crucial, because the omitted testimony is what provided the basis for Gil's immediate arrest, and consequent probable

---

* The dissent has helpfully set forth the suppression court's complete decision verbatim, thus exposing this glaring omission. The court's sole reference to this rather critical event in the record was: "Meanwhile, as Mr. Gil exited the vehicle, he was arrested."

cause for search of his belongings *(see, People v Belton,* 55 NY2d 49). Even if the bag could be considered as having been abandoned in plain view on the back seat, it would still be subject to search incident to Gil's arrest *(People v Scott,* 191 AD2d 200, *affd* 82 NY2d 729).

In short, using the *De Bour* template, the minimal police intrusion in this encounter was, at every level, an appropriate response to their observations and beliefs *(People v Leung,* 68 NY2d 734, 736).

Since our reversal of the suppression of physical evidence also removes the taint from Gil's inculpatory utterance, we note additionally our disagreement with the hearing court's description of that unsolicited admission as flowing from "subsequent questioning" of defendants.

The order of Supreme Court, Bronx County (John E. H. Stackhouse, J.), entered October 20, 1993, which granted defendants' motions to suppress physical evidence and statements made to the police, should be reversed, on the law and the facts, the motions denied, and these indictments remanded for further proceedings.

MURPHY, P. J. (dissenting). The record and accurate factual and credibility findings made by the hearing court warrant an affirmance. The hearing court, Honorable John E. H. Stackhouse, found:

"The defendants, charged with the crimes of Criminal Possession of a Controlled Substance in the First Degree, and Resisting Arrest move to suppress the physical evidence: 2 bricks of cocaine found in a black book bag, and statements made to police officers.

"Dunaway/Mapp and Huntley hearings were held and Sergeant James Gildea and Police Officer John Fra[si]er testified for the People. Based on the credible evidence adduced at those hearings the court makes the following findings of fact and reaches the following conclusions of law: * * *

"The officers testified that on March 2, 1992, at about 9:00 pm they were on a routine motor patrol in the vicinity of Bailey and Sedgwick Avenues in the South Bronx. They were proceeding eastbound on Fordham Road near Sedgwick Avenue when they observed a livery cab go through a red light. The officers turned on their turret light and the cab pulled over and stopped. The officers exited their vehicle and approached the cab, one on each side. Officer Fraiser approached the driver and requested his license, registration and insur-

ance. At the same time Sergeant Gildea approached the passenger side of the cab and observed the two defendants sitting in the back seat. Jose Pena was on the driver's side and Romulo Gil was seated on the passenger side. Sergeant Gildea saw the defendants talking to each other and looking around at the officers and the flashing lights of the police car. He observed [a] heavy and full black bag on the seat between the defendants. Sergeant Gildea testified that he felt uneasy. After Mr. Gil put the bag on his lap, the officer unhooked his weapon and ordered Mr. Gil to put his hands on the back of the front seat. At this point, [Sergeant] Gildea admitted that the defendants were not free to leave.

"Meanwhile, as Officer Fraiser was getting information from the driver, Jose Pena made a number of attempts to exit the cab. He was not permitted to do so, as after each attempt Officer Fraiser pushed the car door closed. Finally, both defendants were ordered out of the cab. Mr. Pena stepped out of the car and reached into his back pocket to get his identification. He then pushed Officer Fraiser and ran away. The officer called for back up and radio cars and unmarked cars responded. Mr. Pena was apprehended and returned to the scene. Meanwhile, as Mr. Gil exited the vehicle, he was arrested.

"Officer Fraiser testified that a bag full of drugs was recovered from the passenger seat of the car. Sergeant Gildea testified that Mr. Gil was holding the bag when he got out of the car, and dropped the bag to the ground. Five minutes later, after back-up police had arrived he picked up the bag, opened it and found the narcotics inside.

"The issues before the court are (1) whether or not there was probable cause to stop the automobile and arrest the defendants (2) whether or not the search and seizure of the black book bag was lawful, and (3) whether or not any statements made by the defendants were voluntary.

"It is well settled that a police officer may stop a motor vehicle when a violation of the Vehicle and Traffic Law is observed. Pennsylvania v. Mimms, 434 US 106, 98 Sup Ct, 330. In this case, the police officers, on routine patrol, saw a livery cab driver go through a steady red light. They therefore had the right to pull the car over to the side of the road and to request information, i.e: a driver's license, the car registration and an insurance card. People v. Ingl[e], 36 NY2d [413]. The court rejects defendant[s'] contention that since the police

did not immediately issue a summons, the traffic violation was improperly used as a pretext to investigate the occupants of the livery cab.

"However, the court rejects the people's position that the events following the traffic violation provided the police with sufficient reason to detain the defendants. The officers had no reasonable suspicion that criminal activity was afoot. There was no testimony that this location was a 'high crime area' or a 'drug prone location'. The simple acts of the defendants in turning around to look at the police car and then engaging in conversation does not create a situation where an officer may reasonably suspect criminal activity. The presence of a black bag on the rear car seat is not in itself inherently suspicious. The rule is that before the police may stop a person pursuant to the common law right to inquire there must exist at the moment of the stop a founded suspicion that criminal activity is present. People v. DeBour, 40 NY2d 210. I find that the defendants['] acts were in no way suspicious during the initial phase of this police encounter. In this case, Mr. Pena initiated the conversation with Officer Fraiser. He wanted to show his identification. He was not permitted to do so. In fact, he was not allowed to leave the car. After Mr. Gil placed the black bag on his lap both defendants were ordered to place their hands on the front seats. Clearly, from that point forward, the defendants were not free to leave. Eventually, they were ordered out of the taxi. Until Mr. Pena ran away, there was nothing which would logically lead the officers to conclude that either of these young men was dangerous. The drugs were not seen or recovered until long after the arrests of the defendants. The defendants were in custody as soon as the police officers ordered them to put their hands on the back of the front seat of the livery cab. People v. Cantor, 36 NY2d 106. '[The police] conduct exceeded that which is permissible during a normal traffic stop, as there was no showing of a reasonable suspicion on the part of the police that the defendant[s were] committing, had committed, or [were] about to commit a crime.' People v. Antelmi [196 AD2d 658, 659] App. Div. 2d Dept.

"The court is troubled by the inconsistent testimony of the police officers as to where and how the cocaine was recovered. The only reasonable conclusion that can be drawn is that the drugs were discovered some time after the defendants were in police custody.

"Therefore, the Dunaway/Mapp motion is granted and the cocaine is suppressed.

"According to the CPL § 710.30 (1) (a) notice the defendants allegedly made potentially inculpatory statements. At the hearing, no reference was made to them at all. Therefore, these statements, are suppressed, as well as any others, as a 'fruit of the poisonous tree'. The officers, having violated the rights of the defendants when they were illegally seized in the cab and subsequently searched, cannot use that seizure to support the subsequent questioning of the defendants."

SULLIVAN, NARDELLI and TOM, JJ., concur with WALLACH, J.; MURPHY, P. J., dissents in a separate opinion.

Order, Supreme Court, Bronx County (John E. H. Stackhouse, J.), entered October 20, 1993, which granted defendants' motions to suppress physical evidence and statements made to the police, reversed, on the law and the facts, the motions denied, and these indictments remanded for further proceedings.