People v Scott (2024 NY Slip Op 51494(U))

[*1]

People v Scott

2024 NY Slip Op 51494(U)

Decided on November 4, 2024

Criminal Court Of The City Of New York, Bronx County

Mikhaleva, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 4, 2024
Criminal Court of the City of New York, Bronx County

The People of the State of New York,

against
Zurino Scott, Defendant.

Docket No. CR-001561-24BX

Defendant by Jesse O. Chung, Esq. and Christine Oh, Esq., The Bronx Defenders. 360 E 161 Street, Bronx NY 10451 jchung@bronxdefenders.org 718-957-9639 and CrOh@bronxdefenders.org
People by A.D.A. Dylan Flanders, Esq., Bronx County District Attorney's Office, 265 East 161 Street, 8th Fl., Bronx NY 10451 FlandersD@bronxda.nyc.gov 718-838-7518

Anna Mikhaleva, J.

Defendant moves to suppress all evidence related to observations of him by the police, including the Intoxicated Driver Testing Unit ("IDTU") video of him and the chemical test results on the grounds that such observations were made unlawfully and in violation of his constitutional rights under both the New York State and Federal Constitutions.
Defendant is charged with (i) Resisting Arrest (PL § 205.30), (ii) Operating a Motor Vehicle While Under the Influence of Alcohol (VTL §1192 [3]), (iii) Operating a Motor Vehicle While Under the Influence of Alcohol (VTL §1192 [2]), and (iv) Driving While Ability Impaired (VTL § 1192 [1]) in connection with an incident that occurred just after 4 A.M. on January 8, 2024, in the vicinity of Magenta Street and Holland Avenue in the Bronx.
On September 10, 2024, the Court conducted a combined Atkins/Johnson/Mapp/Huntley/Dunaway/Payton/Ingle hearing. The People presented one witness, Police Officer Justin Lezcano Ortiz. Officer Lezcano Ortiz's body-worn camera ("BWC") footage was admitted into evidence (People's Ex. 1-A), along with IDTU room camera footage (People's Ex. 1-B). Defense presented no witnesses or submit no evidence. At the conclusion of the hearing, the case was adjourned for post-hearing submissions.
Based on the testimony and evidence presented, the Court now makes the following findings of fact and conclusions of law.
FINDINGS OF FACT
Initially, the Court finds as fact all events depicted in the BWC and IDTU room footage that was admitted into evidence. The Court also credits the testimony of Officer Lezcano Ortiz to the extent set forth below and makes the following specific findings of fact.
Officer Lezcano Ortiz has been employed by the New York City Police Department ("NYPD") for approximately two and a half years. During that time, he has made approximately 56 arrests and participated in 14 others. Two of these prior arrests involved DWI charges. Officer Lezcano Ortiz also received instruction as to DWI arrests during his training in the police academy.
In the early morning hours of January 8, 2024, Officer Lezcano Ortiz was assigned as a Patrol Officer in Police Service Area 8, Randall Avenue, to "provide security" in NYCHA housing developments, specifically the Gun Hill Houses (Tr. at 6-8). He was working with his partner, Police Officer Holzkect, both in uniform and in a parked marked police vehicle, when he observed Defendant drive past their patrol car in a brown vehicle with a Connecticut license plate without stopping or slowing down at a posted stop sign (id. at 10-11). After "witnessing th[is] violation," Officer Lezcano Ortiz turned on the patrol car's lights and sirens, started the car and instructed the vehicle that ran the stop sign to pull over (id. at 11). The vehicle continued without pulling over and Officer Lezcano Ortiz observed it run four more stop signs without stopping or slowing down (id. at 11-12). The legal speed limit in this area was 25 m.p.h. and Officer Lezcano Ortiz testified that he and his partner were travelling approximately 35 m.p.h. while the vehicle they were pursuing was about five car lengths ahead of them (id. at 12).
From his vantage point, Officer Lezcano Ortiz was able to observe the profile of the driver, who he described as having a broad shoulders and dreadlocks. At a certain point in the pursuit, the vehicle came to a stop in front of a residential apartment building, and the officers instructed the driver to stay in the vehicle so they may approach (id.). The driver, however, got out of the driver's side door and started walking into the building despite the officers' instructions to stay in the vehicle. At this point, Officer Lezcano Ortiz noticed an individual come out of the passenger front side of the car, go around the front of the vehicle and drive it away (id. at 13). 
Meanwhile, Defendant continued walking into the building, holding a cup with red liquid inside while repeatedly ignoring the officers' instructions to stop (id.). Notably, at this point, Officer Lecanzo Ortiz was approximately two feet from Defendant and could observe his "delayed" response time, his "extremely watery" eyes and could smell a "heavy smell of alcohol" from Defendant's breath (id. at 14).
Defendant entered the building through two front doors, both of which were unlocked, and proceeded to walk up the steps that were immediately accessible from the building's lobby (id. at 15). Throughout, Officer Ortiz and his partner can be seen on the BWC footage repeatedly instructing Defendant to stop and attempting to get him to stop as he pushes past them, stating that he is going home. Eventually, Defendant and both officers end up all together in front of the door to his apartment, which is just up the aforementioned steps. As Officer Ortiz and his partner begin trying to apprehend Defendant by placing his arms and hands behind his back, Defendant "began to resist and pull his arms in the opposite direction" (id. at 16). As the Officers "continued to apprehend" Defendant, "the door to his apartment had opened, in which [they] saw that it was his son who had opened the door" (id. at 16-17). Defendant, Officer Ortiz and his partner, "all fell in the vestibule of his apartment" (id. at 17). When asked if the apartment door was opened as a result of Defendant's opening the door or someone opening it from inside, Officer Lecanzo Ortiz confirmed that the door was opened from inside (id.).
During this time, Officer Lecanzo Ortiz observed Defendant to have a delayed demeanor and aggressive tone. From his demeanor, the cup, and the smell of alcohol emanating from Defendant, Officer Lecanzo Ortiz formed the impression that Defendant had been operating his [*2]vehicle while intoxicated (id. at 18). At approximately 4:06 A.M., defendant was placed under arrest and transported to the 45th Precinct for IDTU testing (id. at 18-19, 25). 
At the precinct, Defendant was presented with the opportunity to take a chemical test analysis of his breath. The test was conducted by Officer Acosta. Officer Lecanzo Ortiz was present for that test. Defendant was read his rights regarding the test. The test was offered to Defendant at approximately 5:12 A.M. (id. at 26). Initially, Defendant did not consent to testing but after he was warned that his license would be suspended for refusal, he "changed his mind and [] agreed that he would take the test" (id.). Specifically, he interrupted Officer Acosta while he was reading the refusal warning and said, "I'll do it" (id.). The results of the breathalyzer test were .083 BAC.
Defendant was also offered additional coordination tests, which he consented to take, and which were recorded on the IDTU room footage.

CONCLUSIONS OF LAW
Where "a defendant challenges the admissibility of physical evidence or makes a motion to suppress," the People bear the initial burden of production by presenting evidence to show the legality of the challenged police conduct, while the defendant "bears the ultimate burden of proving that the evidence [collected] should not be used against him" (People v Berrios, 28 NY2d 361, 367-68 [1971] [internal citations omitted]). 
Huntley
As an initial matter, at the hearing, the People conceded the Huntley issues and therefore Defendant's noticed statement is suppressed. The Court makes no ruling with respect to any other statement that is audible on the BWC footage or the IDTU room footage.
Ingle
Officer Ortiz credibly testified that Defendant did not stop or slow down at a stop sign, and then continued to drive, without stopping, past four additional stop signs. Based on this testimony, which was confirmed by Officer Lezcano Ortiz's BWC footage, probable cause existed to stop Defendant's vehicle as the officer personally observed Defendant commit multiple violations of the Vehicle and Traffic Law by running multiple stop signs. (People v Hinshaw, 35 NY3d 427, 437 [2020] ["stopping vehicle for a traffic infraction requires probable cause"]; People v Ingle, 36 NY2d 413 [1975] [stop unlawful where no probable cause or reasonable suspicion]). 
Mapp/Dunaway
Once Defendant stopped his vehicle in front of his building and repeatedly disregarded instructions to stay inside, police were able to observe him from a proximity of approximately two feet having a delayed response time, extremely watery eyes and carrying a cup with red liquid, with a heavy smell of alcohol on his breath. Based on this testimony, which the Court finds credible and which is confirmed by BWC footage, the People established that police had probable cause to arrest Defendant based on their observation of his demeanor, their training and [*3]experience with DWIs, and Defendant's repeated failure to stop asked to do so, both before and after he left his vehicle (see Dunaway v New York, 442 US 200 [1979]). As noted, Officer Lezcano Ortiz's testimony was confirmed by his BWC footage, lending further reliability to his already credible testimony. Defendant failed to meet his burden to establish that his arrest was without probable cause. 
The fact that Defendant was finally arrested on the threshold — or even inside — his apartment does not change the Court's conclusion. Although an arrest warrant is generally required to arrest someone in their home, the instant arrest was justified by exigent circumstances as "there was an uninterrupted pursuit of [Defendant] by the police and [] the intrusion into his home was necessary to enable them to attempt to ascertain [Defendant's] blood alcohol level within the two-hour limit prescribed by VTL § 1194" (Matter of Stark v New York State Dept. of Motor Vehs., 65 NY2d 720, 722 [1985]). This two-hour limit exists to ensure an accurate measurement, and "[t]his fact, coupled with the possibility that a suspect could consume additional alcohol upon arriving at his home, makes immediate action by the arresting officer imperative" (Matter of Stark v New York State Dept. of Motor Vehs., 104 AD2d 194, 197 [3d Dept 1984], affd, supra). Indeed, had the police permitted Defendant to go into his home and waited to get an arrest warrant to arrest Defendant, defense counsel would almost certainly be now arguing that any breathalyzer test results that were subsequently obtained — even if obtained within the two hour window prescribed by VTL § 1194 — are unreliable as it would be unknowable whether Defendant was intoxicated when he got home or simply consumed (additional) alcohol after the fact.
Additionally, inasmuch as police initially sought to stop Defendant's vehicle for a traffic infraction only, once he was out of the vehicle, Officer Lezcano Ortiz was able to observe him in close proximity show signs of intoxication which gave police reasonable cause to believe that Defendant had been driving while intoxicated. This, coupled with Defendant's refusal to follow multiple police instructions to stop, created the exigent circumstances that rendered his arrest in the doorway of his home lawful.[FN1]

For the avoidance of doubt, to the extent that the observations of defendant's demeanor took place in front of his building and in the vestibule thereof, New York courts have generally held that there is no "legitimate expectation of privacy in the common areas of [a] building, accessible to all tenants and their invitees" (People v Espinal, 161 AD3d 556, 557 [1st Dept 2018] [internal quotation and citation omitted][).
Moreover, the conclusion that Defendant's arrest was lawful remains the same regardless of whether his son opened the door from inside or Defendant opened his own door while officers were trying to cuff him. It is black letter law that "a suspect may not defeat an arrest which has been set in motion in a public place by the expedient of escaping to a private place" (United [*4]States v Santana, 427 US 38, 43 [1976]; People v Thomas, 164 AD2d 874, 874 [2d Dept 1990] ["a criminal suspect may not thwart an otherwise proper arrest which has been set in motion in a public place by retreating into his residence"]). 
Finally, inasmuch as Defendant argues that the Court should find Officer Lezcano Ortiz's testimony incredible because the criminal court information, which he signed under penalty of perjury, states that at the time of his arrest, "defendant stopped in front of Apartment 1D, and opened the front door," whereas, at the hearing, he testified that it was the son who opened the door, the Court declines to do so. As noted above, Officer Lezcano Ortiz testimony as to the arrest was credible and entirely corroborated by BWC camera footage. He also testified that he did not, himself, draft the information. To the extent there is any discrepancy between the information and what he testified to at the hearing, the Court resolves this in favor of the hearing testimony, which was clear, consistent and corroborated.
As to the results of the breathalyzer tests, the People established that Defendant consented to the chemical breath tests within two hours of his arrest and Defendant did not meet his burden to establish that breathalyzer test results, which were collected as evidence pursuant to a lawful arrest and with his consent to testing after refusal warnings were issued, should be suppressed (see VTL 1194 [2][a]).
This constitutes the decision and order of the Court.
Dated: November 4, 2024
Hon. A. Mikhaleva

Footnotes

Footnote 1:Defendant's argument that no exigency could exist because "police, by their own admission, pursued Mr. Scott for a traffic violation and for his noncompliance with their commands" completely ignores the fact that police observed signs of Defendant's intoxication as soon as he started walking into his building while continuing to ignore their directive to stop (namely, his "extremely watery eyes," smell of alcohol, and delayed response time, as well as the cup containing a red liquid). This, coupled with the surrounding circumstances, is what gives rise to the exigency.