OPINION OF THE COURT
Alfred Donati, Jr., J.
The defendant is charged with criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]). He has *16 moved this court for an order suppressing physical evidence, namely a loaded semiautomatic pistol, and several statements allegedly made to a law enforcement official. A hearing was held before this court at which Police Officer (P.O.) Ralph Hanna, Police Officer William Aragundi, Mr. Ceesay Sail, and Marlene Besterman, Esquire, former Assistant District Attorney, testified. This court credits the testimony of the police officers as trustworthy and credible.
FINDINGS OF FACT
On the evening of January 20, 1994, Police Officers Ralph Hanna, John D’Alessio and William Aragundi were working together in uniform in an unmarked police vehicle. The officers were part of the 32nd Precinct’s Robbery Apprehension Program and were assigned to respond to robberies or violent felonies during their 3:00 p.m. to 11:35 p.m. tour of duty.
At approximately 11:00 p.m., the officers, with P.O. Aragundi driving, were stopped at a traffic light headed westbound at the corner of 154th Street and Eighth Avenue. P.O.s Hanna and Aragundi both testified that they observed a van, traveling southbound on Eighth Avenue, make a right turn ahead of them onto 154th Street. They further testified that the van double-parked several car lengths away from a known "smoke-shop” where the officers had previously made, or had knowledge of, drug and weapon possession arrests. They observed the defendant exit the front passenger seat of the van and enter the shop. The traffic light then turned green and P.O. Aragundi double-parked the police vehicle two-to-four-car lengths behind the van.
The officers observed the defendant exit the shop one or two minutes later and approach the van. Before entering the van, the officers testified that they observed the defendant, who was wearing a waist-length black jacket, make an adjustment to the left side of his waistband. The "adjustment” was demonstrated to the court and appeared to be consistent with the type of movement which moves an object to a more comfortable position in one’s waistband, but also consistent with an innocuous gesture. Both officers testified that at that point they believed the defendant was carrying a gun. However, neither officer testified to seeing an actual object or bulge in the defendant’s waistband.
After the defendant stepped into the van, the van proceeded *17 westbound on 154th Street toward Bradhurst Avenue. The police vehicle followed behind it. At the corner of 154th Street and Bradhurst Avenue the van made a left turn onto Bradhurst Avenue. The driver did not use any signal to indicate that he was about to make a turn. The police vehicle also made a left turn and P.O. Aragundi tooted the police siren once between 154th and 153rd Streets. The driver did not acknowledge the siren by pulling over. P.O. Aragundi put the bubble light on top of the dashboard, tooted the siren again and flashed the high beam lights. The driver of the van then pulled over between 152nd and 151st Streets.
P.O. Hanna testified that after he exited the police vehicle he approached the van and as he did so he saw the defendant, through the tinted windows, making furtive movements. P.O. Hanna also testified that he heard a thumping sound of metal hitting metal once he was standing next to the van and that the defendant was slouched down in the seat at the time. P.O. Hanna ordered the defendant to exit the van and place his hands above the roof, while P.O. Aragundi approached the driver. P.O. Hanna then observed the butt of a gun protruding from underneath the front passenger seat, between the bottom of the seat and a drawer beneath it. After the weapon, which turned out to be a loaded semiautomatic pistol, was recovered, the defendant was arrested and taken to the precinct.
At the precinct’s front desk, the defendant stated before P.O.s Hanna, D’Alessio, Aragundi, and the desk sergeant that he could take a gun charge but not a drug charge and repeatedly asked P.O. Hanna to "get rid of the drugs”.[1] An hour after the arrest, P.O. Hanna was recording pedigree information in the arrest processing room when the defendant stated that he had the gun for protection because he had been shot and stabbed in a midtown pool hall for no reason. P.O. Hanna further testified that at the precinct after the arrest he placed a phone call for the defendant and heard him tell the party that he got caught with a joint, two bags of cocaine and two bags of marihuana. There is no testimony as to when or whether the defendant was given his so-called Miranda warnings.
CONCLUSIONS OF LAW
As further referred to hereinafter, this court makes the *18 factual determination that the stop of the van in the instant case was a so-called "pretext stop” and thus insufficient in law in this State to serve as a predicate for the seizure of the gun involved here. As a result of this finding of a Fourth Amendment violation under New York law applicable to such a stop, this court is bound by law to suppress the gun and statements in this case, based on the rule of law enunciated in Mapp v Ohio (367 US 643 [1961]) and its progeny in this State. However, this conclusion is reached only because of the mandates of current State law, and judicial and legislative reconsideration of these principles is urged for the reasons stated below.
A police officer may validly stop a vehicle after observing a violation of the Vehicle and Traffic Law. (People v Ingle, 36 NY2d 413 [1975].) Absent a traffic violation, a police officer may only stop a vehicle on the basis of reasonable suspicion that an occupant of the vehicle committed, is in the process of committing or is about to commit a crime. (People v Sobotker, 43 NY2d 559 [1978].) Moreover, a traffic infraction may be the basis for a stop of a vehicle, and even an arrest. (CPL 140.10 [1] [a]; Vehicle and Traffic Law § 155.) Generally, however, a stop for an ordinary traffic infraction does not justify a search of a vehicle (People v Class, 63 NY2d 491 [1984]; People v Guzman, 116 AD2d 528 [1st Dept 1986]); and police officers may not use a traffic infraction as a "mere pretext” to investigate the defendant on an unrelated matter. (People v Llopis, 125 AD2d 416 [2d Dept 1986]; People v Mikel, 152 AD2d 603 [2d Dept 1989]; People v Watson, 157 AD2d 476 [1st Dept], lv denied 75 NY2d 971 [1990]; People v Camarre, 171 AD2d 1002 [4th Dept], lv denied 78 NY2d 953 [1991]; People v Vasquez, 173 AD2d 580 [2d Dept], lv denied 78 NY2d 1130 [1991]; People v Smith, 181 AD2d 802 [2d Dept 1992]; People v Melendez, 195 AD2d 856 [3d Dept 1993].) The line of cases cited above follow the rule that the police may not use traffic infractions to justify a stop of an individual when the police action is motivated by other reasons, namely, some suspicion that falls short of a reasonable suspicion that an occupant of a vehicle has committed, is in the process of or is about to commit a crime. In these cases, the stops were predicated on something other than the traffic infractions that the officers observed, but were not based on any objective evidence of criminal activity.
Under New York law, a "pretext stop” is a violation of the Fourth Amendment of the United States Constitution. Fourth *19 Amendment violations will result in suppression of seized evidence under Mapp v Ohio (supra), which held that evidence unconstitutionally obtained is inadmissible in State courts. The decision in Mapp was grounded on a particular rationale, namely that suppression of contraband seized in contravention of constitutional principles will deter police officers from such conduct. In the decades since Mapp, experience demonstrates that the rule is not effectuating the purpose for which it was enunciated. For the most part it does not deter police officers from violating what most of them view as overly technical and unrealistic rules and thus does not protect innocent citizenry from unconstitutional intrusion. Obviously the rule comes into play only if some contraband is found and becomes the subject of a suppression motion. Thus, ironically, the rule has no effect where the innocent citizen has been intruded upon because that search has turned up no contraband and no suppression motion ensues; rather, where a suppression application is granted, the rule has only the irrational result of insulating the guilty.
Judicial experience has also shown that the result of the Mapp rule often leads to both police officers and defendants tailoring their testimony in a given case to meet constitutional standards, rather than adherence to them. Indeed, some law enforcement officials take what they believe is the "pragmatic” approach, namely that even if the contraband recovered in a given case is suppressed for purposes of trial, at least the contraband, i.e., drugs or guns, is "off the streets”. And police officers who take this approach usually sincerely believe that they are carrying out their law enforcement function and duties. In any event, as indicated, the result, as in the instant case, neither protects the innocent nor does justice and this suppression rule, which this court is obliged to follow here, thus both fails in its attempt to protect the citizenry and fails to deter unconstitutional police action.
The need to reexamine the precedent governing this type of case has been the subject of a decision by my esteemed colleague, Justice Harold Rothwax. In People v Nickelson (NYLJ, July 27, 1994, at 22, col 2 [Sup Ct, NY County]), Justice Rothwax reluctantly suppressed a gun recovered in a livery cab containing a persistent violent felon who the officers observed making furtive movements in the rear passenger area. In the instant case, as in Nickelson, the police officers were assigned to an anti-crime unit, apprehended an individual in felonious possession of a gun and, essentially, did *20 so on the basis of their many years of experience generally. In addition, in the instant case the officer’s experience and knowledge included numerous arrests for possession of contraband at the location this defendant emerged from when he made the adjustment in his belt. But again, as in Nickelson, this court is precluded from giving credence to the officer’s experience and accurate judgment based upon their observations of the defendant’s conduct, as the law presently stands. The seizure of this weapon must be suppressed where, despite all of the foregoing, the court cannot reasonably conclude that this police unit stopped this vehicle because of the traffic infraction. The police officers were specifically asked on more than one occasion at the hearing the reason they stopped the van; to their credit they did not "tailor” their testimony but admitted candidly that they were following the defendant and subsequently stopped the van not because of the traffic infraction but because they believed, on the basis of the above-set forth observations and experience with the location the defendant visited, that he was carrying a gun.[2] In connection with the Nickelson case, and the effectiveness of the suppression rule, let it be noted that at least one of the police officers involved in the instant case was, only a few months earlier, also involved in the Nickelson case wherein the gun was suppressed. So much for the police-deterrent value of this rule.
In an article entitled "On 633d License Suspension The Top Scofflaw Is Arrested”, The New York Times reported (Nov. 14, 1994, at 1, col 5) that the arrest of the "phantom motorist”, "the Jesse James of Scofflaws”, who was the subject of the story, "arose by a fluke, not great sleuthing, the police acknowledged”. "It wasn’t the U-turn [the defendant] made * * * in Hunt’s Point at 8:09 p.m, though the officers said that caught their eye. It was the faux license plate — a crudely hand-lettered cardboard thing stuck in the rear window of the beat-up 1980’s Olds Tornado that prompted them to turn on the siren and the flashing lights and to pull him over.” (Id.)
Interrogation of defendant and a computer check of the information he gave led to the discovery of his background; "it took an hour and 45 minutes” for the computer to print out his "hundreds and hundreds of citations”.
*21 The story noted that the problem of unlicensed drivers has swelled in recent years and that after a series of accidents recently in which children and families were struck, leading to public outcries, law enforcement action on the problem of unlicensed drivers intensified (read, analogous to the instant case, the problems of guns and drugs in the streets has "swelled in recent years”) then, apropos to the principle this court is advocating through this opinion in the instant case, the experienced crime reporter writing this story observed: "While [the defendant’s] record appeared to place him in the pantheon of scofflaws, his arrest was more prosaic, even typical, the police said, for it involved no more than a police officer’s alert eye for something unusual— in this case, the cardboard license plate in the window — and a routine computer check” (id. [emphasis added]).
The absolute suppression rule, the law in New York, now is as archaic as finding no right of privacy in the Constitution. In reality the result is not protection of the citizenry but the protection of the individual guilty of possession of guns, drugs, etc., and the insulation of the use of the contraband at trial against the guilty possessor of it.
An example of the extremes to which the mandatory exclusionary rule can be taken is also found in Arizona v Evans (177 Ariz 201, 86 P2d 869, cert granted — US —, 114 S Ct 2131 [1994]), wherein the court below suppressed drugs found upon the execution of an arrest warrant because the warrant had a few days earlier been quashed but a clerical error had left it in the police computer, the police thus executing it in complete good faith. (See also, Wallace, The Exclusionary Rule’s Price to Society Is Too High, Wall St J, Jan. 25, 1995, at A17, col 3.)
As Justice Rothwax observed in Nickelson (supra), the United States is the only country in the western world to apply a mandatory exclusionary rule that has the effect of barring the introduction of the evidence (as compared with weighing all the circumstances including weighing the seriousness of the violation by the police officer against the seriousness of the crime and the effect of excluding the evidence, in seeking to balance the interests of society and the individual’s liberty and privacy interests); nonetheless, judicial systems and the protection of society and of the interests of the individual have survived very well in the rest of the western world.
*22 Since the founding of our Republic, courts have interpreted statutes and even Constitutions in a manner to address developing problems in society as they arise. The problem of guns and drugs on our streets require that the courts do their part to fashion appropriate and practical remedies to address these developments. If the prospect of suppression does not deter illegal police action, and the guilty go unprosecuted, this rule is worse than ineffective, it then simply protects the malfeasor. If the individual unconstitutionally intruded upon does not have a practical remedy and the possessor of guns or drugs has protection, are those the results our society wishes to achieve?
In Bivens v Six Unknown Fed. Narcotics Agents (403 US 388 [1971]), the Court there held that a petitioner had a cause of action to recover money damages for any injuries suffered as a result of a law enforcement official’s violation of petitioner’s Fourth Amendment rights; that is, the Court recognized the right of a defendant to sue and recover monetary damages if a defendant is the subject of an unwarranted search and no contraband is discovered. Such an approach, fine-tuned to truly provide a practical remedy (e.g., absolute liability and a minimum dollar amount of damages), together with replacing the absolute suppression rule with a rule balancing the seriousness of the police action and the crime involved, would better serve the needs of society and the individual. Under such a rule, a "pretext stop” would not automatically be deemed so egregious as to of itself mandate suppression of evidence. The Constitutions of the United States and of the State of New York must afford reasonable protection to the guilty as well as the innocent, but their purposes are not to lead to rules which automatically set the guilty free. In seeking to protect an individual from unwarranted or unreasonable government intrusion, we must not lean over so far backward as to have justice fall flat on its back.
In this case, the officers admitted that they were following the defendant and subsequently stopped the van because they believed he was carrying a gun. Their belief was based upon their trained observations and experience, although not sufficient by current standards to establish the basis necessary for a lawful stop. Upon stopping the van and ordering the defendant to exit, the gun was found in plain view. Notwithstanding any of these facts, this court is obliged to suppress this gun (and the ensuing statements as fruits of a poisoned tree). In doing so, this court urges the New York State Court of *23 Appeals and the State Legislature to overrule the absolute suppression rule as presently formulated and to fashion a practical remedy, including a practical cause of action for damages for a citizen whose Fourth Amendment rights are found to be violated, where that individual is also found not culpable, in order to achieve a better balance of constitutional protection of the individual and protection of society against the contraband that is flooding our streets.
Based upon the foregoing, the motion to suppress is granted in all respects.

. The People, in their discretion, chose not to charge the defendant with drug possession as to the marihuana and cocaine found on his person.

. The hearing transcript reads on page 117, lines 5-8: Q. "So what was your reason for stopping the van, that’s what I’m trying to get to, Officer?” A. "Well, in my mind I believed that the gentleman that got into the van had a gun.”