■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FLOID H. DAVID, Appellant. [636 NYS2d 374] —Appeal by the defendant from a judgment of the County Court, Orange County (Berry, J.), rendered December 14, 1993, convicting him of criminal possession of a controlled substance in the second degree, upon his plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress physical evidence.

Ordered that the judgment is reversed, on the law, the defendant's plea is vacated, that branch of the defendant's omnibus motion which was to suppress physical evidence is granted, and the matter is remitted to the County Court, Orange County, for further proceedings on the indictment.

On March 30, 1993, at approximately 2:20 P.M., State Trooper Michael Colern was seated alone in his marked vehicle monitoring traffic on State Route 17 when he observed the defendant's blue, 1991 Chevrolet Corsica traveling at about 20 miles per hour. When the vehicle was about 20 feet away, the Trooper observed some objects dangling from the rear view mirror. As the Corsica moved to within five feet, he further observed that the defendant was not wearing a seat belt and that the vehicle's inspection sticker appeared to be expired.

Trooper Colern pulled over the Corsica and requested the defendant's license and registration, in response to which the defendant produced a valid operator's license but no registration. As the defendant was searching for his registration, Colern observed portions of two other licenses and asked the defendant if he could look at them. Upon inspecting the licenses, Colern observed that one listed the operator's name as "Floyd Glasgow", while the two others listed the operator's name as "Floyd David".

Trooper Colern, who stated that the licenses "aroused [his]

suspicion", then asked the defendant to step to the rear of the vehicle and as he did so, Colern noticed a pair of gloves on the console between the front seats. According to Colern, the gloves were so-called "sap" gloves, i.e., gloves with either powder or sand in the knuckle area. Upon observing the gloves, Colern placed the defendant and his companion under arrest for criminal possession of a weapon. Colern did not question the defendant with respect to his use of the gloves prior to placing him under arrest. According to Colern, he had never before made an arrest based on the possession of such gloves.

Trooper Robert Meyers then arrived on the scene and Colern requested that Meyers conduct an on-site inventory search of the defendant's vehicle. According to Trooper Colern, the search was governed by Police Regulations which require the officer conducting the inventory to fill out a "General Inventory 21 impound sheet" (hereinafter inventory sheet). Meyers entered the vehicle, scanned the dashboard and within 30 to 60 seconds noticed an air conditioning vent which appeared to be "damaged in some way" and which, upon further inspection, had some screws missing. Meyers looked through the vent louvers and noticed a dark object inside. According to Meyers, he placed two fingers on the vent and "it just popped right open". He then took out the vent grill, reached inside and removed two socks, ripping one of them open. Inside the sock, Meyers discovered a white chunky substance wrapped in a "Bounce sheet" which had been taped close. Notably, immediately after the sock was located, Meyers ceased the inventory.

Trooper Colern had a inventory sheet in his possession, but he did not give it to Meyers prior to Meyers' inventory and Meyers did not utilize the form while conducting the inventory search. Nor did Meyers or Colern fill in the inventory sheet at the scene after the inventory was completed. Colern further stated that the inventory sheet, which was completed later at the State Police barracks, contained no reference to any contraband. Although State Police regulations applicable to such an inventory require that an officer of the rank of sergeant or higher be present before a closed container can be opened, Meyers did not request the presence of such an officer before removing the air conditioning vent and ripping open the sock.

In ruling on the branch of the defendant's omnibus motion which was to suppress physical evidence, the County Court found that Trooper Colern had permissibly stopped the defendant in light of the traffic infractions, and further, that prob-

able cause to arrest existed once the Trooper observed the sap gloves. We reverse.

It is well settled that the " 'police may not use traffic violations as a mere pretext to investigate the defendant on an unrelated matter' " *(People v Smith,* 181 AD2d 802; *People v Llopis,* 125 AD2d 416; *see also, People v Mikel,* 152 AD2d 603; *People v Carvajales,* 152 AD2d 675). The events which transpired after Trooper Colern stopped the defendant reveal that the traffic infraction was utilized as a mere pretext to interrogate the defendant for unrelated crimes and to search his vehicle. The record demonstrates that although Trooper Colern ostensibly stopped the defendant because, *inter alia,* there were objects dangling from his rear view mirror and because he was not wearing a seat belt, the Trooper made no inquiry regarding these alleged violations other than requesting the defendant's license and registration. Nor did he issue any summonses *(cf., People v Smith, supra).* Rather, upon observing a pair of gloves the Trooper placed the defendant under arrest and ordered another Trooper to began searching the defendant's car.

Moreover, Trooper Colern sought to justify the defendant's arrest and the subsequent search of the defendant's car solely upon the assertion that these gloves, which he described as "sap gloves," constituted a type of unlawful weapon. However, there is (1) nothing of a probative nature in the record establishing that the gloves in question were made or adapted for use primarily as a weapon (Penal Law § 265.15 [4]), (2) no testimony that Trooper Colern knew or attempted to ascertain the manner in which the defendant was utilizing the gloves, and (3) nothing from which it could be inferred that the defendant was intent upon using the gloves unlawfully against another person *(see,* Penal Law § 265.01 [2]). Nor are such items specifically denominated as unlawful weapons pursuant to Penal Law § 265.01(1). While an officer's mistaken, but reasonable belief that an object constitutes seizable contraband will not invalidate an otherwise lawful arrest *(cf., People v Argentina,* 150 AD2d 703; *People v Bittner,* 97 AD2d 33, 36), there is insufficient evidence in the record to support such a reasonable belief here. Accordingly, the actions of the Trooper in arresting the defendant and conducting the subsequent search of his vehicle were unlawful.

Lastly, assuming, *arguendo,* that the defendant's arrest was lawful, the inventory search was unlawful. While a warrant based on probable cause is not required in order to conduct an inventory search, "it is an established procedure clearly limit-

ing the conduct of the individual officers that assures that the searches are carried out consistently and reasonably" *(People v Galak,* 80 NY2d 715, 719; *People v Lewis,* 217 AD2d 591). Here, the manner in which the search was conducted demonstrates that the inventory search was "little more than an excuse for general rummaging to discover incriminating evidence" *(People v Galak, supra,* at 719).

The record reveals that although the inventory sheet governed the parameters of the search, Trooper Meyers commenced his inventory search without the inventory sheet in hand. Trooper Colern, who had the inventory sheet in his possession did not even give it to Meyers. Meyers then "inventoried" the vehicle for only 30 to 60 seconds prior to removing the air conditioning grill, made no entries on the inventory sheet at the scene and, in fact, terminated the inventory search as soon as he had removed the air conditioning grill and ripped open one of the socks he had discovered inside *(see, People v Colon,* 202 AD2d 708). Additionally, while the inventory regulations required a superior officer to be present before the opening of any closed compartment or container, Meyers nevertheless removed the air conditioner grill without awaiting the arrival of a superior officer.

When confronted with the closed container regulation, Meyers acknowledged its existence, but then claimed that he "didn't have to" contact a superior officer as the regulations required *(see, People v Lewis, supra).* The inventory sheet never utilized during the inventory, was ultimately filled in later at the police station after the car had been removed from the scene, and the completed sheet omitted reference to the contraband which the officers had removed from the defendant's vehicle. Under these circumstances, the inventory search was not conducted in conformity with the applicable regulations but rather, was subject to "the caprice and personal preference of the individual officers" *(People v Galak, supra,* at 721; *see also, People v Barton,* 203 AD2d 911; *People v Colon, supra).*

Under the circumstances, the branch of the defendant's omnibus motion which was to suppress physical evidence should have been granted. Thompson, J. P., Sullivan, Hart and Goldstein, JJ., concur.