OPINION OF THE COURT
Joel L. Blumenfeld, J.
The defendants are charged with criminal possession of a weapon in the third degree. They have moved for an order suppressing physical evidence, contending to be aggrieved by an unlawful search and seizure. In addition, defendant Eaddy moves for the suppression of statements, contending that they were taken in derogation of his constitutional rights. A hearing to determine the admissibility of this evidence was held *522 before me on March 19, 1997. The People called Officer Robert Hill, whose testimony I find credible.
Officer Hill testified that on September 27, 1996 at approximately 11:40 p.m. he was with his sergeant in an unmarked vehicle waiting for the light to change on the corner of Archer Avenue and 165th Street, Queens. He said that as he sat at the light, he observed a blue vehicle with no headlights on drive through the yellow light and make a right turn onto 165th Street. According to the officer, the rear passenger of the blue car looked back at him as the car was driven through the intersection. He said the vehicle’s headlights came on at this time as well. Officer Hill stated that after the blue car made the right turn, it pulled over to the side of the road, then pulled out at a speed of 15-20 miles per hour, and within about five seconds, pulled back to the right side of the road. At this time, the officer stopped the vehicle on the corner of 165th Street and Jamaica Avenue.
Officer Hill further testified that when the car stopped, its driver, defendant Baddy, exited the vehicle with his hand in a "semi-raised position” and walked toward him. The officer said he ordered him back to the vehicle, then repeated the direction, at which time the defendant returned to his car and sat "halfway into the front” of the driver’s seat. He stated that he approached defendant Baddy, requested his license, and asked him to come to the rear of the vehicle. In response, defendant Baddy told the officer that he did not have his license on him, that he had borrowed his sister’s car, and that he wanted to give the front passenger, defendant Hopkins, a ride, but did not want the rear passengers, identified at the hearing to be defendants Henry and Brewer, in his car. Defendant Baddy then pointed to defendant Brewer and indicated that he did not like him and did not want him in the car. Officer Hill testified that he then directed defendant Brewer to exit the vehicle and that as he did so, he saw a bulge in his waistband area. He said he went to grab the object, but engaged in a scuffle with the defendant. He ultimately retrieved the object, which was a flashlight. The officer stated that after he removed defendant Brewer from the car, he looked into the rear of the vehicle and saw codefendant Ashraf removing a large revolver from his waist area. He said he pulled his service revolver and defendant Ashraf dropped the gun to the floor of the car. He then removed him from the vehicle and called for backup assistance. At this time, the officer saw defendant Henry "kicking his feet * * * underneath the driver’s seat” (hearing transcript, *523 at 24). He told him to show his hands, then removed him from the vehicle. He said a search of the area underneath the driver’s seat resulted in the recovery of a loaded 9mm pistol, which was vouchered, along with the .44 calibre revolver which had been dropped by codefendant Ashraf. The officer further stated that a ski cap was recovered from each of the defendants Ashraf and Henry, and that a ski mask was recovered from defendant Hopkins.
Officer Hill testified, when questioned by the court, that he stopped the car for being driven without headlights and through a yellow light, as well as for reckless driving. He said he never issued any summonses for the Vehicle and Traffic Law violations.
The defendants now move for the suppression of physical evidence and statements.
CONCLUSIONS OF LAW
At issue initially is the validity of the stop of the vehicle in which the defendants were riding. Although the court credits the testimony of Officer Hill that he observed the vehicle drive through a yellow light and put its headlights on as it did so, conduct which constitutes a violation of the Vehicle and Traffic Law and which therefore would generally justify the stop (People v Ingle, 36 NY2d 413 [1975]), it appears to the court that the attendant circumstances surrounding the stop render it more likely that a Vehicle and Traffic Law infraction was a mere pretext for the stop, and that the officer’s actions were motivated by his desire to investigate the defendants. The officers involved in the stop were street crime undercover officers returning to Randall’s Island at the end of their shift and not uniformed officers on routine motor patrol who would clearly be more likely to issue summonses for traffic infractions and other minor offenses. Furthermore, the police did not immediately stop the defendants’ vehicle upon observing two Vehicle and Traffic Law violations. Instead, they followed the vehicle for no stated purpose, without issuing a summons, enabling them to continue their surveillance of the vehicle and its occupants. Under the circumstances, the court finds that the traffic infraction was a mere pretext to stop the defendants’ car to investigate the possibility that the defendants were engaging in criminal activity, which, according to some New York cases, is improper.
In People v Spencer (84 NY2d 749, 753 [1995], cert denied 516 US 905), the Court of Appeals held that "police stops of *524 automobiles in this State are legal only pursuant to routine, nonpretextual traffic checks to enforce traffic regulations or when there exists at least a reasonable suspicion that the driver or occupants of the vehicle have committed * * * a crime”.
In People v David (223 AD2d 551, 553 [2d Dept 1996]) and People v Roundtree (234 AD2d 612, 613 [2d Dept 1996]), the Second Department reiterated its position that "the ' "police may not use traffic violations as a mere pretext to investigate [a suspect or] defendant on an unrelated matter” ’ ”. (223 AD2d, at 553.)
In People v Laws (213 AD2d 226, 227 [1st Dept 1995], lv denied 85 NY2d 975 [1995]), the First Department held that the auto stop was improper because it was clear that the car was pulled over not for a Vehicle and Traffic Law infraction, but because the police "were motivated by the unsupported suspicion that criminal activity was afoot” (see, People v Smith, 181 AD2d 802 [2d Dept 1992]; People v Watson, 157 AD2d 476 [1st Dept 1990], lv dismissed 75 NY2d 971 [1990]).
Having found the stop of the defendants’ vehicle to be pretextual, the court must determine whether or not this finding invalidates the stop. It appears that under the above-cited cases, it may. However, the United States Supreme Court, in its recent decision in Whren v United States (517 US —, —, 116 S Ct 1769, 1774 [1996]), held that the constitutional reasonableness of traffic stops does not depend "on the actual motivations of the individual officers involved”. It found that once a police officer has "probable cause to believe [that a motorist] has committed a civil traffic violation”, his decision to stop the vehicle is reasonable, and that any improper ulterior motive he may have had for the stop will not invalidate it (517 US, at —, 116 S Ct, at 1771).
The question then becomes to what extent is this court bound by the Supreme Court ruling in Whren (supra) or, put another way — has Whren overruled these cases. Defendant Brewer argues that the Whren ruling is not binding, for the Whren Court itself held that their ruling is not ground-breaking, but is a reiteration of previous holdings which are fully consistent with it, so that the New York cases which have subsequently invalidated traffic stops on pretext grounds have, in effect, already disregarded it. He further posits that the Second Department decision in People v Roundtree (supra), which upheld suppression on the basis of pretext, was decided after the ruling in Whren, a fact which he claims to be additional evidence that *525 the New York courts have opted to ignore the holding in that case.
In the opinion of the court, there is an insufficient basis for this court to conclude that the New York courts have affirmatively rejected the United States Supreme Court interpretation of the Fourth Amendment of the Federal Constitution. The Court in Roundtree (supra) did not cite Whren (supra), nor did it embrace the New York State Constitution in order to circumvent its ruling.* As to the New York cases which have apparently run afoul of the Supreme Court ruling that motivation is irrelevant to an otherwise valid traffic stop, a ruling which, according to the Whren Court, has been in place since the 1970s, the court finds that notwithstanding the Court’s assertion that the holding in Whren has been the law for decades, it appears that it has not been so perceived. For example, in United States v Cummins (920 F2d 498, 501 [8th Cir 1990], cert denied 502 US 962 [1991]), the Eighth Circuit held that a "valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity”. In reaching this conclusion, it held that "'[ajlthough the Supreme Court has not directly decided this issue, the Court has told us in unmistakable terms that we are to make 'an objective assessment of the officer’s actions’ ” (at 501 [emphasis supplied]). Obviously, the issue is not clear. Nevertheless, even assuming, arguendo, that the Whren rule had been articulated previously, the court finds that there is no evidence that the New York courts, by continuing to adhere to the rule that a pretext stop vitiates an otherwise valid auto stop, were affirmatively disregarding the Supreme Court. An extensive review of these cases reveals that the issue was never addressed. The New York courts did not recognize the disparity in interpretation, then resolve the problem by relying on the New York State Constitution in order to provide its citizens with greater protection than that which would be afforded under the Federal Constitution, a premise which Justice Price of the Bronx County Supreme Court adopted in People v Williams (NYLJ, Aug. 5, 1996, at 29, col 1). Not one of the cases dealing with pretext stops cited the New York State Constitution, or even alluded to the competing *526 legal principles. In fact, the one case which indirectly addressed the issue held that "given the State’s vital interest in promoting safety on its public highways [citing People v Ingle, 36 NY2d 413, supra], the defendant’s final contention, that this court should afford him greater constitutional protections under the State Constitution than those afforded to the defendant * * * by the United States Supreme Court under the Federal Constitution is without merit” (People v Mathis, 136 AD2d 746, 748 [2d Dept 1988], lv denied 71 NY2d 899 [1988]). Furthermore, on the rare occasions when the courts have cited constitutional law as the basis for their decisions, they have cited the Federal Constitution and/or the United States Supreme Court cases which have interpreted it. For example, in People v Owens (164 Misc 2d 15, 18 [1995]), the court held that "[u]nder New York law, a 'pretext stop’ is a violation of the Fourth Amendment of the United States Constitution” (see also, People v Ingle, supra; People v Sobotker, 43 NY2d 559 [1978]; People v Spencer, 84 NY2d 749, supra). Under the circumstances, the court finds that to construe the holdings in those New York cases which were silent as to the basis of their decisions as having been made in reliance upon the State, as opposed to Federal, Constitution would be to strain logic and precedent (see, Ohio v Robinette, 519 US —, —, 117 S Ct 417, 420 [1996], which held that "when 'a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so’ ”). In the opinion of the court, the New York cases dealing with pretext stops have implicitly based their holdings on Fourth Amendment grounds, believing that the Federal Constitution and its interpretation by the Supreme Court supported these holdings. Accordingly, the court rejects the contention that the New York courts have already grappled with the distinction between Whren and its own cases and has resolved the matter by interpreting its own Constitution. Rather, it finds that the issue is a new one which awaits resolution.
The question then before the court is whether New York should interpret its own Constitution to provide its citizens with broader protection than that which is afforded under Whren (supra). In making this assessment, the court must be guided by prior cases in New York in which the courts have *527 had to consider whether they were bound by the Federal Constitution, or could instead rely on the State Constitution.
In People v Johnson (66 NY2d 398, 406 [1985]), the Court of Appeals held that "this court has repeatedly stated that the proscription against unlawful searches and seizures contained in NY Constitution, article I, § 12 conforms with that found in the 4th Amendment, and that this identity of language supports a policy of uniformity between State and Federal Courts. Thus * * * we have chosen to fashion our rules to promote consistency in the interpretation we have given to the two clauses”.
However, in People v Reynolds (71 NY2d 552, 557 [1988]), the Court of Appeals noted that principles of Federalism permit the State the right to afford its citizens "greater insulation from governmental intrusion” than that which is provided by the Fourth Amendment, but held that such power should be "cautiously exercised, however, because * * * the identity of language in the two clauses [of the State and Federal Constitutions] supports a policy of uniformity in both State and Federal courts”.
It appears clear that the New York courts have the authority to interpret the New York State Constitution to provide broader protection to its citizens than that afforded under Whren (supra). Nevertheless, the court finds that the decision to expand on the rights afforded by the Fourth Amendment by interpreting the New York State Constitution is not one which may be made by a lower court Judge.
In People v Keta (165 AD2d 172 [2d Dept 1991], revd on other grounds 79 NY2d 474 [1992]), the hearing court Judge granted the defendant’s motion to suppress physical evidence by determining that the applicable statute was violative of the New York State Constitution. In reversing that decision, the Second Department held that "[a]s a threshold matter, the hearing court’s holding with respect to the scope of the State Constitution impinges upon the policy and rule-making function traditionally perceived as the exclusive domain of the Court of Appeals” (at 177). It found that where "State-wide policy considerations govern, in part, any inquiry into the existence of enhanced protection by the State Constitution * * * we must temper our actions with restraint in deference to the Court of Appeals’ role as the State’s policy-making tribunal” (at 177-178). It further held that "[i]n short, the Court of Appeals is best suited to effectively weigh the policy concerns which must be considered in order to determine *528 whether the recognition of a separate right under the State Constitution is, in fact, required” (at 178).
Accordingly, until there is a Court of Appeals ruling on whether the decision in Whren (supra) is inapplicable to the citizens of New York, this court finds that it is now constrained to apply its holding to the case at bar, and so upholds the stop of the vehicle on the basis of the traffic infraction, despite its pretextual nature.
The court notes, as the Whren decision (supra) points out, that although suppression of evidence under the Fourth Amendment is not the appropriate remedy for a pretext stop, such a stop may violate the Constitution’s guarantee of equal protection of the laws. Accordingly, should the defendants be successful in demonstrating that the police violated their rights under the Equal Protection Clause, they might very well have an alternate remedy.
The remainder of the decision has been deleted for publication purposes.
Based upon the foregoing, the defendants’ motions to suppress physical evidence and statements are denied.

 A recent Second Department case, People v McCoy (— AD2d —, —, 1997 NY Slip Op 05002 [2d Dept, May 12, 1997]), has cited Whren (supra), not to distinguish it, but in support of its holding that the traffic stop was "no less valid merely because the officer might have been entertaining more serious suspicions”.