OPINION OF THE COURT
Laura Visitación-Lewis, J.
Indicted for criminal possession of a controlled substance in *114 the second and third degrees (Penal Law § 220.18 [1]; § 220.16 [1]), defendant Edward Dickson moves to suppress cocaine and currency seized from his person following the stop of an automobile in which he was the front seat passenger. At a Dunaway /Mapp hearing held before me, Police Officer Edward Maier testified for the prosecution, and the driver of the automobile, Anthony McNair, testified for the defense.
The legal issue framed by the hearing evidence is that subsumed within the category of cases designated in decisional law as pretextual automobile stops. This area of law, in which matters of policy and constitutional concerns often compete with the practicalities of law enforcement, has been the subject of particularly close analysis and renewed interest since the United States Supreme Court’s ruling in Whren v United States (517 US 806 [1996]).
The Court of Appeals has not had occasion to address the issue of pretextual automobile stops in light of the Whren ruling, and it is therefore as yet unresolved whether New York will adopt the Federal constitutional standard enunciated therein. However, the ample and rapidly developing body of both lower court and Appellate Division case law in this area provides guidance and — despite a division in approach and interpretation among trial courts — presages adherence to New York’s long-standing constitutional prohibition against the use of a traffic stop to legitimize an otherwise impermissible investigation. As applied to the case at bar, the venerable objectives reflected by our State’s precedent and underlying policy considerations compel suppression.
On the basis of the credible evidence adduced at the hearing, I make findings of fact and reach conclusions of law as follows.
Findings of Fact
At approximately 11:15 a.m. on October 11, 1997, Police Officer Edward Maier was in a police vehicle on the east side of Amsterdam Avenue between 133rd and 134th Streets with two other officers. Part of a “buy and bust” operation consisting of plainclothes officers in several unmarked vehicles parked in the vicinity, the officer was awaiting radio contact informing him that the undercover officer was ready to make a narcotics purchase. As he waited, Officer Maier noticed a car with Rhode Island license plates double-parked at a bus stop, approximately one block north and on the same side of Amsterdam Avenue as Officer Maier’s vehicle. The out-of-State car had its *115 motor running and was occupied by three men: the driver, Anthony McNair, a front passenger and a rear passenger.
Officer Maier observed the front passenger emerge from the vehicle and join the passenger in the rear seat, and continued to watch as the driver then made a U-turn and stopped on the west side of Amsterdam Avenue at 134th Street. Within one minute, defendant ran to the car from a westerly direction and occupied the front passenger’s seat. The car then drove off.
Based upon these observations, Officer Maier concluded that the vehicle’s occupants may have been involved in “a robbery, a burglary, or any other serious crime”, and required immediate investigation. Such was his sense of urgency about the need to pursue the vehicle that the officer did not simply radio in its description and location so that other officers in the vicinity could investigate. Rather, Officer Maier notified his team members for assistance, knowing that this would abort the entire drug operation. In his hearing testimony, the officer forthrightly stated that he would not have taken such a drastic measure to stop the vehicle for a mere traffic infraction. This was, in his estimation, more than an ordinary traffic stop and, indeed, it was his intent to ask defendant why he had run to the car. The illegal U-turn was recognized as a factor in the vehicle stop only in the “totality of the circumstances”.
Defendant’s vehicle was followed for 9 or 10 blocks before Officer Maier determined that it was “tactically correct” to stop it at the corner of 125th Street and Amsterdam Avenue since the other police cars had by then arrived, providing “safety in numbers”. The vehicle was stopped at a red light when three or four of the unmarked police cars converged on the scene and approximately seven officers emerged. Some of the officers, including Maier, had guns drawn.[1]
As Officer Maier approached defendant and directed that he put his hands in the air, a second officer went to the driver’s *116 window and told McNair to turn off the ignition. Asked for his license and registration, McNair responded that he had a valid driver’s license, but did not have it with him, and stated that the car had been rented by defendant and his girlfriend. McNair was then ordered out of the car, told to put his hands on the roof of the car, and patted down. Nothing was recovered from his person.
Meanwhile, Officer Maier was noting that there was “something funny” about defendant’s abdomen, which was “odd-shaped”. For safety, he ordered defendant out of the car at gunpoint, directing him to keep his hands in the air. Defendant complied, and Officer Maier patted him down, but found nothing.
Officer Maier next asked defendant why he had run to the car, and defendant explained that he had been getting some food. Because he had not seen defendant in possession of food containers during his observations, Officer Maier responded that he did not believe him. Defendant then said, “I just got a little something for my head”, and gestured towards his watch pocket, from which Officer Maier proceeded to remove a small, clear plastic bag containing what appeared to be cocaine. Defendant was then placed under arrest and taken to the sidewalk, where a more thorough search revealed a larger plastic bag of cocaine and $1,223 on his person.
The entire backup team participated in taking the four occupants of the vehicle into custody. While denying that the racial composition of the men in the car had served to enhance his suspicions, Officer Maier admitted on cross-examination that he might have told defendant after his arrest that he should have left the group’s one white male at home.
McNair was never told that he had made an illegal U-turn and was released from the precinct without a traffic summons. Ultimately, defendant was the only person charged with possessing the cocaine that forms the basis of this indictment.
Conclusions of Law
In its own words, the Court of Appeals has “stated, time and again, that the [police] stop of an automobile is a seizure implicating constitutional limitations” and will be upheld only when undertaken “pursuant to routine, nonpretextual traffic checks to enforce traffic regulations or when there exists at *117 least a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime [citations omitted]” (People v Spencer, 84 NY2d 749, 752-753 [1995]). The proscription against pretextual stops, i.e., the use of a traffic violation as a means of effecting an otherwise impermissible stop, has long served as a corollary to our State’s policies and constitutional standards. (See, People v Singleton, 41 NY2d 402, 404 [1977] [absent probable cause or reasonable suspicion, stops are valid solely pursuant to “nonarbitrary, nondiscriminatory, uniform procedures, such as at roadblocks, checkpoints and weighing stations”]; People v Sobotker, 43 NY2d 559, 564 [1978] [reasonable suspicion must be based on more than a mere “ ‘hunch’ ” or “ ‘gut reaction’ ”]; People v Ingle, 36 NY2d 413, 420 [1975] [stops which are “the product of mere whim, caprice, or idle curiosity” are prohibited]; see also, People v Troiano, 35 NY2d 476, 478 [1974].)
The ruling of the Supreme Court in Whren v United States (517 US 806 [1996], supra), decided on June 10, 1996, has occasioned reexamination of pretextual stops in this State, leading to reconsideration of the New York rule by some courts. In contrast to that well-established prohibition against permitting the police to rely upon traffic violation stops as a means of investigating unrelated matters, the Whren Court ruled that a credible, objective traffic infraction foreclosed examination of the actual motivations of the individual officers who made the stop because “[s]ubjective [police] intentions play no role in ordinary, probable-cause Fourth Amendment analysis.” (Supra, at 813.)
Significantly, the Whren Court described its holding as consistent with its own decades-old decisions, citing, inter alia, United States v Robinson (414 US 218 [1973]) and quoting Scott v United States (436 US 128, 136, 138 [1978]), where the Court stated, “Subjective intent alone * * * does not make otherwise lawful conduct illegal or unconstitutional * * * [T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer’s action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.”
Thus, an analysis of whether and, if so, how, Whren (supra) may affect the New York law must recognize that the Whren Court did not view its pronouncement as constituting a new Federal standard. This is important because, to the extent that different courts have expressed concern regarding the continued *118 validity of the State’s standard (see, e.g., People v Brewer, 173 Misc 2d 520 [Sup Ct, Queens County 1997, Blumenfeld, J.]; People v Rosario, NYLJ, Sept. 6, 1996, at 22, col 1 [Sup Ct, NY County, Altman, J.]), or whether New York case law assumed the convergence of Federal and State constitutional standards on this issue (see, People v Williams, NYLJ, Aug. 5, 1996, at 29, col 1 [Sup Ct, Bronx County, Price, J.]), New York has never, in the Supreme Court’s view, followed the Federal standard.
The New York Rule
It is instructive to review what, exactly, our State’s standard has been. In case after case, at both the trial and appellate levels, New York courts have either explicitly or implicitly employed a primary motivation test. This standard necessarily involves a dual purpose. While the police have observed a traffic violation and have a legitimate right to stop the car to enforce the traffic laws, they also entertain unrelated concerns that fall short of reasonable suspicion, much less probable cause. The hearing court examines the officer’s subjective, as well as objective, reasons for stopping the vehicle, and determines, as a question of fact, whether a pretext or ruse was employed.[2] If it is found that the primary motivating factor for the stop was the traffic violation, the stop will be deemed nonpretextual and therefore valid. (See, e.g., People v Washington, 238 AD2d 43 [1st Dept 1998] [stop motivated by car driven wrong way on one-way street, not by suspicion of robbery in progress]; People v Peterson, 245 AD2d 815 [3d Dept 1997] [stop motivated by excessive speed, not by suspicion of drug running]; People v McGriff, 219 AD2d 829 [4th Dept 1995] [stop motivated by excessively tinted windows, not by unrelated criminal activity]; see also, People v Woods, 189 AD2d 838 [2d Dept 1993] [stop motivated by tinted windows, not investigation of recent robberies; suppression granted on other grounds].)
Where, however, the court finds that the police did not act primarily to enforce the traffic regulation, but, rather, for reasons that were not constitutionally sound, the ostensible *119 reason for the stop is ruled pretextual, and the stop invalidated. (See, e.g., People v Laws, 213 AD2d 226, 227 [1st Dept], lv denied 85 NY2d 975 [1995] [stop not motivated by broken taillight, but by fact of out-of-State rental car parked near drug location late at night]; People v Ynoa, 223 AD2d 975 [3d Dept 1996] [stop not motivated by defective headlight, but by suspicions that car contained drugs and large quantity of United States currency]; People v Camarre, 171 AD2d 1002 [4th Dept 1991] [stop not motivated by traffic infraction, but by suspicion of drug activity]; People v Llopis, 125 AD2d 416 [2d Dept 1986] [stop not motivated by parking infraction and speeding, but by occupants’ suspicious movements]; see also, People v Roundtree, 234 AD2d 612 [2d Dept 1996]; People v Smith, 181 AD2d 802, 803 [2d Dept 1992]; People v Vasquez, 173 AD2d 580 [2d Dept 1991].)
Although the Court of Appeals has never directly addressed the primary motivation standard long employed in New York, it has clearly announced that “in this State” pretextual automobile stops are prohibited. (People v Spencer, 84 NY2d 749, 753, supra.) Reconsideration of the New York rule is not warranted by Whren which, by its own terms, has enunciated a Federal standard in place since 1973. (Whren v United States, 517 US 806, 813, supra.) Thus, some trial courts have concluded that a separate State constitutional basis underlies the massive body of pretextual stop case law in New York. (See, e.g., People v Williams, NYLJ, Aug. 5, 1996, at 29, col 1 [Sup Ct, Bronx County, Price, J.], supra; People v Lynch, NYLJ, Dec. 29, 1997, at 23, col 1 [Crim Ct, Bronx County, Webber, J.].) Although no explicit appellate holding to this effect has been rendered, the Appellate Divisions for the First, Second and Third Departments have all, in post -Whren decisions, implicitly relied upon the State Constitution by continuing to apply the State’s primary motivating factor test to determine subjective intent.
Thus, for example, in People v Martinez (246 AD2d 456, 457 [1st Dept 1998]), the First Department held that “the [hearing] court’s application of a subjective test for determination of the legality of the stop is in accordance with previous decisions of this Court” (citing People v Rijo, 220 AD2d 217 [1st Dept 1995], and People v Laws, 213 AD2d 226, supra). Moreover, the First Department pointedly went on to state that “[t]he holding of the United States Supreme Court in Whren v United States (517 US 806) does not compel a contrary result”. (Supra, at 457, citing People v Scott, 79 NY2d 474, 496-497 [1992].) The *120 First Department’s reliance upon Scott is significant, as the Court of Appeals there observed that “[although the language of the State and Federal constitutional proscriptions against unreasonable searches and seizures generally tends to support a policy of uniformity * * * we have not hesitated in the past to interpret article I, § 12 of the State Constitution independently of its Federal counterpart when necessary to assure that our State’s citizens are adequately protected from unreasonable governmental intrusions [citations omitted]” (People v Scott, 79 NY2d, at 496-497).
Similarly, in Washington (238 AD2d, at 49, supra), the First Department concluded that it was not necessary to reach the applicability of the Federal standard because the automobile stop was valid under the New York rule prohibiting pretextual traffic stops. In the Third Department, post -Whren rulings have likewise continued to apply the primary motivation test, and have done so without any attempt to analyze or distinguish Whren (supra) and, indeed, without reference to it. (See, e.g., People v Grow, 249 AD2d 686 [3d Dept 1998]; People v Peterson, 245 AD2d 815, supra; People v Young, 241 AD2d 690, 692 [3d Dept 1997]; People v Tillie, 239 AD2d 670, 672 [3d Dept 1997]; People v Lamb, 235 AD2d 829 [3d Dept 1997].)
The Second Department, on the other hand, has been viewed as having adopted the Federal standard in People v McCoy (239 AD2d 437 [2d Dept 1997]; see, e.g., People v Cruz, NYLJ, Aug. 28, 1997, at 25, col 4 [Sup Ct, Queens County, Roman, J.]; People v Ruocco, NYLJ, Mar. 9, 1998, at 34, col 4 [Nassau County Ct, DeRiggi, J.]). A careful examination of McCoy, however, as well as the Second Department’s subsequent rulings in this area, indicates that the Second Department may not, in fact, have abandoned the New York primary motivating factor test. In making its determination, the McCoy Court first acknowledged the “broad proposition” that, under New York law, “ ‘[t]he police may not use traffic violations as a pretext to investigate the defendant on an unrelated matter’ ” (supra, at 439, quoting People v Llopis, 125 AD2d, supra, at 417, and citing Appellate Division decisions from the Second, Third, and Fourth Departments). Then, prefacing the discussion with the word “[a]lso”, McCoy went on to cite the Federal standard with approval, and to conclude that, on the particular facts under review, the traffic violations justified the stop (at 439). As presented, therefore, it appears that the Federal analysis was referenced to support the Second Department’s analysis under State law, not to replace or supplant the State standard.
*121 Indeed, in a case decided on the same day as McCoy (supra), the Second Department cited New York law alone in rejecting a claim that a traffic stop was pretextual. (People v Britz, 239 AD2d 428, 429 [2d Dept 1997].) Moreover, in subsequent decisions, the Second Department has continued to assess whether a stop was pretextual by relying exclusively on New York law, and without a single reference to Whren (supra; see, People v Wilson, 250 AD2d 788 [2d Dept 1998]; People v Jackson, 241 AD2d 557 [2d Dept 1997]; People v Gelley, 242 AD2d 277 [2d Dept 1997]).
It would appear, therefore, that the adherence to the primary motivation standard of the First Department, by which this court is bound, is shared by the Second Department, as well as by the Third Department. No post -Whren ruling has yet been issued by the Fourth Department. Such an approach is consistent with the policies which have long served as an underpinning of New York’s constitutional protections. The Court of Appeals has repeatedly emphasized the need to ensure that the police not act arbitrarily or use unfettered discretion where there exists the danger that such power will be abused at the expense of personal liberty. (See, People v Ingle, 36 NY2d 413, 419, supra; People v Galak, 80 NY2d 715, 721 [1993]; People v Spencer, 84 NY2d 749, 758, supra.)
As trial courts, we cannot and do not ignore the practical realities of law enforcement, and are ever cognizant of the need to balance public safety against constitutional concerns. We also cannot blind ourselves to the dangers inherent in according the police the discretion that Whren (517 US 806, supra) seems to permit. If, in fact, the subjective intent of police officers is not to be considered in the face of a credited traffic violation, then we have effectively eliminated the decades-old protection against stops based upon whim, caprice, idle curiosity, hunch, or gut reaction. (People v Ingle, 36 NY2d, supra, at 420; People v Sobotker, 43 NY2d 552, 564, supra.)
More troubling still, the inability to look past a proffered broken taillight or speed violation precludes exploration of malevolent motives, such as stops based upon racial profiling. Indeed, the Whren Court noted that such stops would be impermissible (517 US, supra, at 813), even as it espoused a standard that would effectively ban examination of such motives. Recent highly publicized events graphically demonstrate the dangers to and disparate treatment of our citizens inherent in the stripping of these protections. (See, Racial ‘Profiling’ at Crux of Inquiry Into Shooting by Troopers, NY Times, May 8, *122 1998, at B1, cols 2-5;[3] On Wealthy Island, Being Black Means Being a Police Suspect, NY Times, May 10, 1998, at A12, cols 1-5; see also, People v Young, 241 AD2d, supra, at 692-693.)
Simply stated, if the police have discretion to chose whether to stop or to ignore automobiles that are, for example, exceeding the speed limit, then the possibility of stops predicated upon reasons antithetical to our values and offensive to our State constitutional standards is greatly enhanced. It has never been, and should not now be, the law of our State that we cannot reject offensive, albeit subjective, reasons for police action. Nor has the Court of Appeals hesitated, when necessary, to invoke our own Constitution to extend greater protection than that provided by the Fourth Amendment. (See, People v Scott, 79 NY2d 474, 495-502, supra; People v Harris, 77 NY2d 434 [1991]; People v Class, 67 NY2d 431 [1986].)
Conclusion
On the record in the case at bar, it is clear that Officer Maier was not primarily motivated to stop the vehicle because of the traffic infraction. Not only did he testify as such, but the police action taken was consistent with his stated purpose of investigating the possibility that the occupants of the car had committed a serious crime.
The three observations Officer Maier made, however — one passenger changing seats in the car, an illegal U-turn, and a person running up to and reentering a waiting car — are innocuous whether considered singly or together, and, therefore, do not give rise to a reasonable suspicion. (See, People v Cantor, 36 NY2d 106, 112-113 [1975].) At best, the information possessed by the officer would have accorded him a common-law right of inquiry, which permits neither a seizure nor the intense, accusatory interrogation that occurred in this case. (See, People v Milaski, 62 NY2d 147, 155-156 [1984]; People v Campbell, 245 AD2d 191 [1st Dept 1997].)
Accordingly, I find that the stop of defendant’s automobile was unlawful, and conclude that the fruits thereof must be *123 suppressed. (See, People v Watson, 157 AD2d 476 [1st Dept 1990].) The traffic violation was not the primary motivation for the seizure of the vehicle, and the remaining observations of the police did not justify the measures taken or support the full-blown seizure that followed.

. Officer Maier claimed no knowledge of whether other officers had drawn their guns, as described by McNair, and initially denied that he had drawn his own. When pressed on cross-examination, however, Officer Maier equivocated on this significant fact, saying, “I don’t think so, no.” Given his uncertainty and the totality of the circumstances surrounding this encounter, which strongly suggests that defendant was being questioned at gunpoint, I find to the contrary. The record is, for example, replete with references to defendant’s hands being raised in the air and remaining there throughout the officer’s inquiry. At one point, defendant is described as gesticulating toward his pocket with his head, while keeping his hands in the air. In the context of the officer’s abandonment of the planned drug operation, his expressions of serious safety concerns and the fact that other officers deemed it necessary to draw weapons, it simply defies logic that the officer who *116 sounded the alarm would approach defendant without having drawn his own weapon.

. Some confusion has been engendered by varying uses of the term “pretext”. At times, it appears that the Court simply does not believe that a traffic violation occurred. (See, e.g., People v David, 223 AD2d 551 [2d Dept 1996]; People v Mezon, 140 AD2d 634 [2d Dept 1988].) In the majority of cases, however, “pretext” is used when the traffic violation is credited, but was not the primary motive for the stop.

. In describing the incident in which four young men en route to a college basketball clinic were pulled over and wounded by New Jersey State Troopers, the authors noted that, “[flor years there have been accusations that troopers along the New Jersey Turnpike — where virtually everyone drives over the 55-mile-per-hour limit — were pulling over black or Hispanic drivers solely based on race, in hope of making drug arrests.” (Racial ‘Profiling’ at Crux of Inquiry Into Shooting by Troopers, op. cit.) “Profiling” is the police term for this practice; African-Americans attribute the stops to “D.W.B.” — Driving While Black.